Filed 10/14/16; unmodified opn. attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Marriage of SHARY NASSIMI and ESTHER NASSIMI. | B259704 c/w B260574 (Los Angeles County Super. Ct. No. BD495672 |
| SHARY NASSIMI, Appellant, v. ESTHER NASSIMI, Respondent. | ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT |

THE COURT:*

It is ordered that appellant's request to modify filed October 4, 2016 be granted and that the opinion filed September 26, 2016 be modified as follows:

page 8, footnote 12, the following sentence "Appellant sought to add her as a necessary party, but the district court rejected the request." is deleted;

page 8, footnote 12, the following sentence is added to the end of the footnote: "Appellant subsequently sought to dismiss the Chamberlain lawsuit for failure to join an indispensible party, but the district court rejected the request.";

page 21, line 13, the following footnote is added after the sentence ending "November 2014 orders.": "Appellant is represented by new counsel on appeal."

This modification does not change the judgment.

_____
*EPSTEIN, P. J.                    WILLHITE, J.              MANELLA, J.

2

Filed 9/26/16 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Marriage of SHARY NASSIMI and ESTHER NASSIMI. | B259704 c/w B260574 (Los Angeles County Super. Ct. No. BD495672) |
| SHARY NASSIMI, Appellant, v. ESTHER NASSIMI, Respondent. | |

APPEAL from orders of the Superior Court of Los Angeles County. Thomas Lewis, Judge. Reversed in part and affirmed in part and remanded with directions.

Honey Kessler Amado for Appellant.

Lurie, Zepeda, Schmalz, Hogan & Martin, Kurt L. Schmalz and Shawn M. Ogle for Respondent.

Appellant Shary Nassimi, formerly married to respondent Esther Nassimi, contends the trial court erred in concluding that he, alone, was financially responsible for defending and settling a claim brought by a third party seeking, among other things, rescission of an agreement to sell the business he owned and operated during the marriage. We conclude the liability arising from the claim for rescission and other relief initiated by the third party was a community obligation omitted from the marital dissolution judgment that divided the couple's assets and obligations, subject to division under Family Code section 2556.[1] We find, therefore, that respondent was obligated to pay half the cost of settling the litigation and reverse the court's order to the extent it denied appellant this relief.

With respect to the costs and attorney fees appellant incurred prior to the settlement, appellant's litigation expenses included the cost of his unsuccessful pursuit of certain counterclaims. The expense of pursuing those claims was allocated to him by the judgment, and appellant failed to present sufficient evidence to enable the trial court to distinguish fees and costs potentially chargeable to respondent for defense of the third party's claims for affirmative relief from fees and costs incurred in pursuit of appellant's counterclaims. Accordingly, we affirm the court's order to the extent it denied appellant's request for reimbursement of attorney fees and costs.

The trial court, having found against appellant on the above issues and on other issues raised in the underlying family law proceeding that are not part of this

---

[1] Family Code section 2556 provides that in a proceeding for dissolution of marriage, "the court has continuing jurisdiction to award community estate assets or community estate liabilities to the parties that have not been previously adjudicated by a judgment in the proceeding." Undesignated statutory references are to the Family Code.

4

appeal, awarded respondent attorney fees as the "prevailing party" pursuant to the terms of the judgment. We agree the prevailing party provision of the judgment controlled. However, in view of our partial reversal of the trial court's order, we reverse the attorney fee award in favor of respondent and remand for reconsideration of the identity of the prevailing party, if any.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant and respondent were married for 21 years. In August 2008, they separated. Their judgment of dissolution was entered in June 2009.

A. *Sale of Appellant's Business*

In July 2007, one year prior to the couple's separation, appellant sold International Electronics, Inc. (IEI), the business he owned and operated during the marriage, to The Chamberlain Group, Inc. (Chamberlain).[2] Under their agreement (hereafter, "the Purchase Agreement"), Chamberlain agreed to pay $14 million up front, a $12,000 per month consulting fee for two years, and a percentage of net sales revenue attributable to IEI products for five years, up to a total of an additional $10 million.[3] One million dollars of the up front payment was held in an escrow account as a reserve against any claims by Chamberlain against appellant

---

[2] IEI manufactured and sold a number of radio wave-controlled devices, including wireless intercom systems, walkie-talkies and baby monitors. Chamberlain is a large manufacturer of radio wave-controlled products.

[3] The payments due based on a percentage of net sales are referred to as "[e]arn-[o]ut" payments.

5

that might arise within 24 months of the sale.[4]  The Purchase Agreement stated that "[t]o Seller's Knowledge, no event has occurred or circumstance exists that . . . may cause [IEI] to violate any Law . . . ."[5]

Although appellant owned all the shares of IEI in his own name and signed the Purchase Agreement as the sole "Seller," he has never disputed that IEI was community property.  In July 2007, respondent signed a "Consent of Spouse" document, consenting to the sale, approving the provisions of the Purchase Agreement, and acknowledging that IEI and its assets, "including any community property interest that [she] may have in them," were subject to the Purchase Agreement.  A substantial portion of the cash proceeds from the sale were spent on the couple's residence on Sea View Drive in Malibu, which they owned free of mortgage at the time of separation.[6]

B. *Judgment of Dissolution*

In June 2009, the parties entered into a stipulated judgment of dissolution, which included a mediated financial settlement.  The judgment incorporated the parties' agreement concerning the division of property, referred to as the marital

---

[4]     After the payment into escrow and subtraction of certain closing costs, the couple received just over $12 million.

[5]     "'Law'" was defined to include "any . . . regulation . . . of any Governmental Body."  "Knowledge" was defined as "the actual knowledge after reasonable investigation of Seller" and three other employees, including Jim Crider, IEI's chief engineer.

[6]     The remaining $1.5 million from the sale of IEI was divided by the couple equally when they separated.  The Sea View property was sold in February 2013 for approximately $8.7 million.

settlement agreement.[7] The couple's two residences, including the home on Sea View, were deemed community property, as was the $12,000 per month consulting fee due appellant under the Purchase Agreement. Each spouse was awarded 50 percent of these assets.

The 2009 judgment addressed the funds in the escrow account. Paragraph 7(g) of the judgment provided: "All right, title, and interest in the following claims is awarded to the parties equally: Escrow claim against IEI in the amount of $1 million. The parties shall share in any recovery equally, and shall pay the cost of pursuing such claim (including attorneys' fees) equally."

The next paragraph, 7(h), dealt with earn-out payments. It provided: "All right, title, and interest in any claim against Chamberlain arising from conflicting interpretations of the earn-out provisions of the sale of [IEI] to Chamberlain is awarded to [appellant]. Respondent shall have no right to share in any recovery, and no obligation to pay all or any part of the cost of pursing any such claim (including attorneys' fees). [Appellant] shall indemnify and hold respondent harmless against liability on account of any counter-claim or cross-complaint that may be filed by Chamberlain against the parties, excluding any claim covered by paragraph 7.g.i. [sic] of this Judgment."[8]

Paragraph 10 dealt with "[c]ommunity [d]ebts." Paragraph 10(f) stated: "Except as otherwise provided in this Judgment, any community debt or joint debt that has not been previously paid or provided for shall be paid by the party who

---

[7] We refer to both the judgment and the incorporated marital settlement agreement as "the 2009 judgment" or "the judgment."

[8] There is no paragraph 7.g.i. The parties agree the reference is to 7(g).

incurred such debt who shall indemnify and hold the other party harmless against any liability on account thereof."

Paragraph 13 was entitled "Separate Liabilities." Subparagraph (a) provided that appellant "shall pay and discharge as and when due all debts incurred by him after the date of separation and shall indemnify and hold respondent free and harmless against any liability on account thereof." Subparagraph (b) imposed a similar liability on respondent. Subparagraph (c) provided: "[T]he parties acknowledge and agree that neither party has an obligation to pay any expense incurred by the other except as provided in this Judgment. Unless the parties agree to allocate payment responsibility between themselves for an expense incurred by one of them, the expense shall be paid by the party who incurred it, who shall indemnify and hold the other party harmless against liability on account thereof."

Paragraph 34 contained the parties' mutual releases. In paragraphs 34(a) and (b), appellant and respondent released each other from "any and all rights, claims, demands, debts, obligations, liabilities, costs, expenses, causes of action, and judgments, which exist or which [appellant] may claim to exist in favor of [appellant] and against respondent with regard to or arising out of any transactions or event[s] that occurred prior to the date of this Judgment." Paragraph 34(c) stated: "[T]he parties understand and agree that the released claims are intended to and do include all claims, known or unknown, suspected or unsuspected, foreseen or unforeseen, which either [appellant] or respondent ha[s] or may have against the other arising out of or relating to any transaction or event that occurred prior to the

date of this Judgment . . . ." Paragraph 34(c) included a waiver of rights under section 1542 of the California Civil Code.[9]

C. *Chamberlain Litigation*

In April 2008, nine months after the sale and several months before the parties separated, Chamberlain sent a "Claim Notice of Buyer to Seller and Escrow Agent," asserting that there were eight IEI products not in compliance with Federal Communications Commission (FCC) regulations, as they were "not being manufactured in accordance with the approved specifications," and that necessary certification could not be located for three other products.[10] The letter stated: "Seller's failure to disclose that numerous products failed to meet FCC regulations prior to and as of the closing date of the transaction constitutes a breach of [various provisions in the Purchase Agreement]. [¶] . . . [¶] Jim Crider [IEI's chief engineer] has admitted . . . that he had actual knowledge of these issues and has admitted . . . that Seller had actual knowledge of these issues. Indeed, Mr. Crider will testify that Seller instructed him to make the change to the Transmitter [one of the products identified as noncompliant] which resulted in noncompliance with FCC

---

[9]     Civil Code section 1542 provides:  "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

[10]     The escrow instructions provided that within two years of the date of the Purchase Agreement, "Buyer may deliver a claim notice . . . to Seller and Escrow Agent.  The Claim Notice will briefly state the factual basis or circumstances for the Claim, and either (i) specify in reasonable detail . . . the amount of Buyer's Losses, (ii) provide a reasonable estimate of Buyer's Losses, or (iii) indicate if Buyer, in good faith, is unable to specify the amount of Buyer's Losses or make a good faith, reasonable estimate of its Losses."

regulations." The next month, Chamberlain sent a follow-up letter, in which it estimated the cost of addressing the product noncompliance identified in the April letter at approximately $285,000, not including any FCC fines or penalties that might be imposed.[11]

In July 2009, Chamberlain filed suit against appellant in the United States District Court for the Western District of Washington.[12] The complaint was based on the provision in the Purchase Agreement representing that IEI was in compliance with all applicable laws and regulations. It alleged that Chamberlain had discovered that "many, if not all" of the devices manufactured by IEI did not comply with applicable regulations. Chamberlain contended that IEI's employees, acting under appellant's direction, modified software coding to make it appear the devices at issue were transmitting in a low-power range when tested by FCC laboratories, but thereafter restored the higher power levels for manufacture and

[11] During this same period, appellant was in communication by email with an attorney and the broker who assisted him with the sale of IEI, discussing the possibility of suing Chamberlain for failing to produce and market IEI products subject to the earn-out provisions. The emails discussed in detail the IEI products appellant believed Chamberlain could have sold to produce earn-out payments and why he believed he had a viable claim under the earn-out provisions. They also discussed Chamberlain's claim on the escrow account. In one email, appellant stated his belief that Chamberlain intended "to hit [him] for more than [$1 million]." In another, appellant stated he anticipated "a fight" and needed "to start . . . a strong and robust offense." The broker urged appellant to "file a counterclaim" and "sue them in California . . . ."

[12] Respondent was not named. Appellant sought to add her as a necessary party, but the district court rejected the request. In December 2009, appellant and respondent entered into an agreement that "preserve[d] any claim for contribution for or indemnity against liability, fees, and costs incurred in the [Chamberlain] Lawsuit, while avoiding any need to name [respondent] as a party or third-party in the . . . Lawsuit."

sale.  Chamberlain sought to rescind the transaction or, in the alternative, to obtain monetary damages for breach of contract and misrepresentation.

Appellant filed a counterclaim seeking release of the escrow sums.  In addition, the counterclaim alleged that Chamberlain had breached the Purchase Agreement by failing to provide earn-out payments.  Appellant contended, among other things, that Chamberlain violated its duty of good faith and fair dealing by failing to focus any of its resources and sales efforts on IEI products.

In 2010, the district court granted summary adjudication on certain issues involved in the competing claims.  The court granted Chamberlain summary adjudication in part on its claim for breach of contract, finding that many IEI devices exceeded the power limits set by the FCC in violation of the express warranty of the Purchase Agreement, that Chamberlain had established as a matter of undisputed fact that IEI's chief engineer, James Crider, had modified certain IEI devices for testing in order to create the appearance of compliance with FCC regulations, and that Crider's knowledge bound appellant under the terms of the Purchase Agreement.[13]  The court did not resolve whether the breach was sufficiently material to justify rescission or determine any damage issues, but indicated that based on the parties' experts' testimony, damages could range from hundreds of thousands of dollars to $16 million.

The court granted summary judgment to Chamberlain on appellant's counterclaim seeking the escrow monies, finding that Chamberlain's viable breach of contract claim precluded their immediate release.  The court denied

---

[13]     With respect to appellant's knowledge, the court found that Crider "discussed with [appellant]" that "at least some of the IEI devices at issue" exceeded FCC power limits.

11

Chamberlain's motion for summary judgment on appellant's earn-out counterclaim, finding that a jury could reasonably conclude Chamberlain's failure to market, develop and sell IEI products in the years following the sale breached either the Purchase Agreement or Chamberlain's duty of good faith and fair dealing.

In January 2011, a few months after the order of summary adjudication issued, Chamberlain and appellant settled. Appellant agreed to pay Chamberlain $1 million from his own funds, and to release the $1 million in the escrow account to Chamberlain.[14]

D. *Proceedings Below*

    1. *February 2010 Order Finding Chamberlain's Rescission-Related Claims to be an Omitted Obligation*

In September 2009, prior to the Washington court's grant of summary adjudication and the ensuing settlement, appellant moved in the court below for an order requiring respondent to share equally in the ongoing costs of the Chamberlain litigation. Appellant contended that because the Purchase Agreement was entered into during the marriage and involved community property, the expenses of the litigation were owed by the community. He further contended that the claims asserted by Chamberlain were not covered by the provisions of the 2009 judgment, urging the court to treat it as an "unadjudicated debt of the marriage"

---

[14]     Appellant did not have the funds on hand to pay the additional $1 million. Accordingly, he provided Chamberlain a promissory note secured by a deed of trust on the Sea View property, and Chamberlain was paid with interest when the property sold in February 2013.

subject to section 2556.[15] He also sought declaratory relief establishing that respondent would be responsible for half of any judgment, should Chamberlain prevail.

Respondent filed opposition, disputing that any part of the Chamberlain litigation or its associated costs were liabilities omitted from the 2009 judgment.[16] She contended: (1) that under paragraph 7(h) of the judgment of dissolution, appellant was obligated to pay the expenses of litigation between himself and Chamberlain, without regard to whether appellant or Chamberlain initiated it, unless the expenses related to a claim on the escrow fund; (2) that paragraph 34 (the parties' mutual release of unknown claims) released her from any liability for the costs of the litigation; (3) that appellant "incurred" the debt for purposes of paragraph 10(f) (applicable to unknown community debt), as he was "the party to the contract and the party that allegedly defrauded Chamberlain," while respondent "never had any knowledge regarding the operation and business practices of IEI"; and (4) that the attorney fees and other litigation expenses were "incurred" after the

---

[15]  As noted, section 2556 grants the family court continuing jurisdiction to divide community assets and liabilities not previously accounted for in any judgment entered in the dissolution proceedings. It further provides: "A party may file a postjudgment motion or order to show cause in the proceeding in order to obtain adjudication of any community estate asset or liability omitted or not adjudicated by the judgment. In these cases, the court shall equally divide the omitted or unadjudicated community estate asset or liability, unless the court finds upon good cause shown that the interests of justice require an unequal division of the asset or liability."

[16]  Respondent acknowledged in her opposition that pursuant to paragraph 7(g), she was responsible for one-half of the costs of pursuing a claim to the $1 million escrow fund. She estimated, however, that claims related to the escrow fund represented a de minimis percentage of the litigation.

13

date of separation and were appellant's separate and sole responsibility under paragraph 13.[17]

In February 2010, following a hearing, the court entered an order granting in part and denying in part appellant's petition. The order stated: "The Court finds that the liability of the parties with respect to the action for *rescission and other related relief filed by* [*Chamberlain*] *against* [*appellant*] *in the . . .* [*Chamberlain litigation*] constitutes an undisposed of obligation of the Community Estate of the parties in this action." (Italics added.)[18] The finding was made "without prejudice to all claims and defense[s] of the parties under the Judgment of Dissolution of Marriage," and the court reserved jurisdiction "to the fullest extent permissible under the law to make such other further findings and orders concerning the rights and liabilities of the parties under the Judgment." The court stated that it was "satisfied . . . that the parties never contemplated that Chamberlain would sue for rescission," rendering the Chamberlain litigation "'an undisposed of [liability].'" However, the court explained that it did not intend its order "'to be fully dispositive of all the rights of [respondent] to claim certain defenses that might be

---

[17] To support her position, respondent filed a declaration in which she stated: "During . . . negotiations, . . . I told [appellant] that I did not want to be financially obligated to pay attorney's fees, costs or other expenses for litigation between [appellant] and Chamberlain beyond our making a claim to collect the $1 million held in an escrow fund from the IEI transaction. . . . I did not want to bankroll [appellant's] fight with Chamberlain over the IEI transaction or [appellant's] purported $10 million 'earn-out' claim against Chamberlain."

[18] Appellant urged the court to include in its order language indicating that respondent was responsible for one-half of all attorney fees and costs incurred in connection with the Chamberlain litigation. Instead, the court order stated only that the action for "rescission and other related relief filed by Chamberlain" constituted an omitted obligation of the community.

14

available to her,'" and stated its intention to conduct an evidentiary hearing "'to litigate the scope of the liability of the parties.'"[19]

### 2. *2014 Evidentiary Hearing*

The evidentiary hearing took place in the first half of 2014. Three witnesses testified: appellant, respondent and Randall Beighle, one of the attorneys who had represented appellant in the Chamberlain litigation. Appellant, who was not an engineer, testified that he had not instructed IEI's engineers to design products to violate FCC requirements. He understood that some products were modified prior to testing for the convenience of the laboratory: for example, products that were designed to transmit radio frequencies intermittently were modified to transmit the frequencies continuously so they could be more easily measured. In addition, Chamberlain had its own testing facilities, and it was appellant's understanding that Chamberlain had tested IEI's products prior to the sale. In any event, he believed the problems identified by Chamberlain could easily have been mitigated had Chamberlain desired to manufacture and sell IEI products.

Concerning the circumstances surrounding the execution of the 2009 judgment, appellant testified that at the time, he was aware of Chamberlain's claim seeking reimbursement of a portion of the escrow funds. In addition, he and respondent had discussions with a Washington attorney about the possibility of

---

[19] Respondent noticed an appeal. By order dated May 9, 2011, this Court dismissed the appeal as premature, stating: "[T]he written order and the family court's accompanying remarks establish that further proceedings must occur before the court determines whether and how the cost and liability arising from the Chamberlain action should be allocated under section 2556. Because the order is not final for purposes of section 2556, it is not appealable. [Citation.]"

15

pursuing a claim against Chamberlain under the earn-out provisions of the Purchase Agreement. He denied anticipating that Chamberlain would bring a suit for rescission of the entire agreement.[20]

Respondent testified that she knew little about the sale to Chamberlain. She was not aware when she signed the 2009 judgment that Chamberlain had claimed that IEI's products were not FCC compliant. At the time, her main concern was the funds in the escrow account.

Concerning the expenses of the Chamberlain litigation, attorney Beighle testified that appellant paid his firm over $1 million, including fees, costs and interest -- $322,558.67 during the litigation and $769,375 when the Sea View property sold. Beighle acknowledged that significant amounts of time were spent on appellant's earn-out counterclaim. He also acknowledged that some of the work included in the billing was contrary to respondent's interests, such as attempting to have her joined as a necessary party in the litigation and assisting appellant with the family law dispute.

Although the 2009 judgment assigned to appellant the costs of litigating claims related to the earn-out provisions of the Purchase Agreement and the court's February 2010 order stated that the omitted obligations were those related to Chamberlain's action for rescission and other affirmative relief, Beighle had made no attempt to allocate attorney fees between the defense of Chamberlain's action

---

[20]     The court sustained objections to all questions concerning the parties' understanding of the meaning of the provisions of the 2009 judgment, finding it to be inadmissible parol evidence. The court stated repeatedly that the provisions were not ambiguous, and during the hearing, issued an order precluding the attorneys from asking either party about the interpretation of the agreement. Neither party challenges the court's decision to exclude parol evidence.

and the pursuit of appellant's earn-out counterclaim. He took the position that appellant's counterclaim had been filed defensively and that, in any event, all the claims and counterclaims were related, eliminating the need to differentiate. He was not asked by appellant's counsel to determine the percentage of attorney time spent on the earn-out counterclaim. When asked on cross-examination if any billing entries pertained to "whether or not Chamberlain had a right to obtain the escrow money," he replied "probably 50 percent or 75 percent" or "more" based on his belief that the escrow dispute and Chamberlain's general damage claims were one and the same. He did not explain how he arrived at that percentage or indicate that he had undertaken any review of the bills.

Appellant, too, initially testified that all the attorney fees and costs billed by Beighle's firm should be divided equally between himself and respondent as, in his view, the claims and counterclaims were related and the pursuit of the earn-out counterclaim may have induced Chamberlain into a more favorable settlement. As the hearing progressed, he made an attempt to allocate the fees for work on different issues in the litigation, a task rendered difficult by the fact that attorneys in Beighle's firm tended to include work on both the claims and counterclaims in the same entry.[21] Appellant reviewed the bills and prepared an exhibit purporting

---

[21] To illustrate, an entry on one of the bills from Beighle's firm stated that an attorney spent 4.20 hours "draft[ing], edit[ing], and revis[ing] answer, affirmative defense, and counterclaims for purposes of preparing pleading for filing, and review amended complaint for purpose of finalizing answer and counterclaims." This is a form of "block billing," which occurs when "a block of time [is assigned] to multiple tasks rather than itemizing the time spent on each task." (*Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1010; see *Robinson v. City of Edmond* (10th Cir. 1998) 160 F.3d 1275, 1285 ["The term 'block billing' refers to 'the time-keeping method by which each lawyer . . . enters the total daily time spent working on a case, rather than itemizing the time

*(Fn. continued on next page.)*

17

to summarize the portion excludable as time spent on the earn-out counterclaim. He explained that if an entry for a single block of time indicated the attorney had performed work on multiple issues, one of which was the earn-out counterclaim, he would divide that block of time by the number of issues to arrive at the percentage attributable to each. He then multiplied the time in the entry by that percentage to arrive at the amount to exclude for work on the counterclaim.[22] The court admitted the exhibit into evidence, but stated that appellant's formula did not appear to represent a reasonable approximation of the amount incurred for fees potentially recoverable from respondent, as it was "just multiply[ing] a gross number by a formula that [appellant] created."

After the court questioned his allocation exhibit, appellant tried another approach. He went through each of the billing statements he had received from Beighle's firm and marked entries for blocks of time that were, in his view, completely unrelated to his earn-out counterclaim. Many of these entries, however, reflected attorney time spent in ways that were antithetical to respondent's interests, such as work on the request to join respondent as a necessary party, or otherwise not specifically related to defending Chamberlain's claims, such as work on a tax issue. Appellant did not summarize these entries or

---

expended on specific tasks'"]; *In re Tom Carter Enterprises, Inc*. (Bankr. C.D. Cal. 1985) 55 B.R. 548, 550 ["[R]ather than breaking out the time spent on each function on a daily basis, counsel has one charge for each day and then indicates all the services rendered during that day"].) In addition, multiple entries referred to work on the "summary judgment" motion without distinguishing between opposing Chamberlain's or preparing appellant's. Similarly, references to work on "discovery" seldom indicated whether the discovery pertained to Chamberlain's claims, appellant's counterclaim or both.

[22] The exhibit is not in the record, but according to the court's order, appellant estimated that the excludable amounts ranged from $43,424 to $164,307.

18

present the court with a total of the fees they represented.[23]  Moreover, in the midst of this testimony, appellant stated that he had changed his mind about a number of the billing entries he had marked, further confusing the record.

Respondent presented evidence to undermine appellant's attempted allocation.  She prepared a spreadsheet summarizing time billed by the attorneys at Beighle's firm for work actively opposed to her interests, work on matters personal to appellant, and time spent on appellant's counterclaims, which she identified by the presence of the word "counterclaim" in the billing entry.  She concluded $297,410 of the amount billed fell into one of these categories.  She did not attempt to allocate entries that did not include the term "counterclaim" but might have been related to it, such as work on the "summary judgment" or "discovery."

3.  *September 2014 Order Resolving Respondent's Obligation to Share in the Costs of the Chamberlain Litigation*

After hearing the evidence and reviewing the parties' post-hearing memoranda, the court issued a written order denying appellant's request that respondent share in the settlement costs, attorney fees or other expenses of the Chamberlain litigation.[24]  The basis for the court's denial was explained in a detailed written order.

---

[23]    The court inquired whether appellant intended to prepare a new exhibit. Counsel stated proper allocation would be dealt with in closing argument.  Instead of closing argument, the parties filed post-hearing briefs.  Appellant's post-hearing brief is not in the record provided by the parties.

[24]    In the proceedings below, appellant also sought to be compensated for his time and efforts in maintaining the Sea View property after the parties' separation and prior to its sale.  Respondent contended that appellant breached the 2009 judgment and his fiduciary duty to her by transferring her share of the escrow

*(Fn. continued on next page.)*

The order reflected a change in the court's previously expressed view that the expenses of the action for rescission filed by Chamberlain were an undisposed of community obligation. Noting that paragraph 7(h) said appellant was to indemnify and hold respondent harmless against liability on account of any "counter-claim . . . by Chamberlain," the court concluded that "whether Chamberlain filed a 'complaint' against [appellant] alone and not a 'cross-complaint' or 'counter-claim' against 'the parties'" was "immaterial," and that "[t]he timing or the technical name of pleadings that resulted in the Chamberlain Litigation should not control." The order explained, however, that this analysis represented a possible "alternative basis for the court's ruling," and that "the court does not, and need not, determine the cause based on this alternative consideration."

The order went on to explain that respondent was clearly not obliged to share in the cost of matters "not related to the defense of the Chamberlain lawsuit," such as attorney work performed in pursuit of appellant's earn-out counterclaim. Nor was she required to share in the expenses of "legal work . . . that was adverse to [her]." Thus, appellant was required to present credible evidence allocating the fees and costs. The court found that appellant "failed to carry his burden of proof to show the amounts he incurred as a result of the Chamberlain litigation are amounts for which [respondent] should be liable." Referencing appellant's attempt to untangle the entries in the attorneys' bills, the court stated: "Even on direct

account to Chamberlain without her express permission. The court found that appellant was entitled to no compensation for his efforts in connection with the Sea View property. It rejected respondent's claim that appellant had breached his fiduciary duty to her in connection with the funds in the escrow account. The parties do not challenge these findings.

20

examination, [appellant] could not properly establish his arbitrary percentages to support his calculations for the billing statements of his attorney. Simply because [he] reconstructed billing statements as a means of supporting his claims, there was no foundation for the application of these calculations to support his requested recovery." The court further found: "[Appellant's] case in support of the amount of the billing cheargeable to [respondent] is nothing more than speculative recasting of past block billing statements of his attorneys which are buttressed by his own self-serving conjecture as to a percentage of the work that should be chargeable to [respondent]." In short, appellant's attempts to allocate the fees was based on "speculative unsubstantiated assumptions," and devoid of "reliable, credible evidence."[25]

With respect to the cost of settlement, the court ruled that respondent would not be required to reimburse appellant for a share of the additional $1 million, plus interest, he paid Chamberlain to settle the litigation. The court concluded that the interest was appellant's responsibility, and that the settlement was not a "community settlement," because respondent and the community were not included in the settlement agreement or the release.

### 4. *November 2014 Order Awarding Respondent Attorney Fees as the "Prevailing Party" in the Underlying Family Law Proceeding*

After the court denied appellant's request for reimbursement, both sides sought an award for the attorney fees and costs of the underlying family law

---

[25] The court also found that the dollar amount of appellant's claim was "padded," pointing to $140,000 in interest charges and improperly included or "double count[ed] . . . travel and other expenses." The court found that excluding such amounts would reduce the attorney fees to approximately $810,000.

21

proceeding. Appellant based his claim to entitlement on a traditional family law need-based theory (§ 2030).[26] He further contended he was entitled to attorney fees as sanctions (§ 271).[27] Respondent also sought fees under section 271, but primarily contended she was entitled to fees as the prevailing party under the attorney fee provision in the 2009 judgment.[28]

In an order filed November 17, 2014, the court rejected both sides' requests for fees as sanctions under section 271, stating: "The parties had a legitimate dispute concerning the Chamberl[a]in litigation." The court found the secondary claims pursued by the parties "lacked merit," but "d[id] not conclude that it was unreasonable for the parties to assert [them]." Concerning appellant's need-based theory, the court stated that "[i]f fees were recoverable under section 2030, it is

---

[26]     Subdivision (a)(1) of section 2030 provides: "In a proceeding for dissolution of marriage, . . . and in any proceeding subsequent to entry of a related judgment, the court shall ensure that each party has access to legal representation . . . to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding."

[27]     Section 271, subdivision (a), provides: "Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys."

[28]     Paragraph 38(b) stated: "If either party files an Order to Show Cause or other proceeding to interpret or enforce any of the provisions of this Judgment, the Court shall award the prevailing party his or her actual attorneys' fees, accountants' fees, other experts' fees, and costs reasonably and necessarily incurred in connection therewith without regard to need or ability to pay."

22

arguable that [appellant] might have a basis for recovery" because "[he] had substantially higher attorney's fees and costs associated with the litigation." It found, however, that "the parties contracted for a prevailing party standard in lieu of section 2030" based on paragraph 38(b), citing *In re Marriage of Guilardi* (2011) 200 Cal.App.4th 770.

The court then examined the parties' entitlement to attorney fees and costs under the 2009 judgment's fee provisions. The court found that each party prevailed on some issues: respondent prevailed on the issues related to the expenses of the Chamberlain litigation and appellant's claim for compensation for maintaining the Sea View property, and appellant prevailed on respondent's claim of breach of fiduciary duty. Offsetting the fees attributable to the countervailing claims, the court awarded respondent $391,915.86.[29] Appellant noticed appeals of the court's September 2014 and November 2014 orders. The appeals were consolidated.

## DISCUSSION

A. *Status of Chamberlain Litigation Debt*

    1. *Status as Community Debt*

Preliminarily, we explain why the expenses of the Chamberlain litigation -- the attorney fees and costs, as well as the settlement incurred -- would be a community debt in the absence of any alternative arrangement between the

---

[29] Although respondent's appeal of the February 2010 order had been dismissed, the court concluded that the appeal "advance[d] the principal object of the litigation," and included the fees expended on the appeal in her award.

23

parties.[30]  Under California law, "all property . . . acquired by a married person during the marriage while domiciled in this state is community property" (§ 760), including the fruits of both spouses' "expenditures of time, talent, and labor . . . ." (*In re Marriage of Dekker, supra,* 17 Cal.App.4th at p. 850.)  Thus, although it was a sole proprietorship held in appellant's name, IEI was community property -- and the profit derived from the sale of IEI to Chamberlain was community profit.  (See *id.* at p. 851 ["It is well settled in California that income produced by an asset takes on the character of the asset from which it flows"].)

As the obligations arising from the sale of IEI to Chamberlain were incurred during the marriage, the community estate was liable for them.  (*Lezine v. Security Pacific Fin. Services, Inc.* (1996) 14 Cal.4th 56, 64 (*Lezine*); § 910, subd. (a) [community is liable for "a debt incurred by either spouse . . . during marriage, regardless of which spouse has the management control of the property and regardless of whether one or both spouses are parties to the debt or to a judgment for the debt"]; see *Century Sur. Co. v. Polisso* (2006) 139 Cal.App.4th 922, 942 [where husband entered into contract on behalf of family business, "[wife] with a community property interest in the business, . . . would be legally obligated to pay a judgment against him"]; *Reynolds and Reynolds v. Universal Forms, Labels*

---

[30]  Generally, appellate review of a trial court's resolution of the character of a particular item of property as separate or community "is limited to a determination of whether any substantial evidence supports the finding." (*In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 849.)  Where, as here, the resolution "requires a critical consideration, in a factual context, of legal principles and their underlying values," the determination involves "a mixed question of law and fact that is predominantly one of law," and is reviewed de novo.  (*In re Marriage of Davis* (2004) 120 Cal.App.4th 1007, 1015; accord, *In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734.)

24

(C.D.Cal. 1997) 965 F.Supp. 1392, 1396 [where multiple couples were sued based on husbands' alleged violations of contractual promises of confidentiality, court dismissed wives, but observed that plaintiff could potentially recover from the couples' community estates].)[31]

As explained in *In re Marriage of Feldner* (1995) 40 Cal.App.4th 617, 622-626 (*Feldner*), the conclusion that the community is responsible for breaches of contract committed by either spouse follows from a reading of two related provisions in the Family Code:  (1) section 903, which states that "'a contract . . . debt' is 'incurred' . . . [when] the contract is 'made'"; and (2) section 910, which states that "'[e]xcept as otherwise expressly provided by statute, the community estate is liable for a debt incurred by either spouse . . . during marriage . . . .'" (*Feldner, supra,* 40 Cal.App.4th at p. 622, quoting §§ 903 & 910.)  "When [sections 903 and 910 are] read together . . . , the effect . . . is to characterize contract debts as community [debts] when the contract is 'made' . . . during the marriage." (40 Cal.App.4th at p. 622; accord, *In re Soderling* (9th Cir. 1993) 998 F.2d 730, 733 ["Under California law, all community property is liable for debts of either spouse incurred . . . during marriage. [Citations.]  In this context, a 'debt' is

---

[31]    As our Supreme Court explained in *Lezine*, community property is liable to third party creditors not only for "debts incurred for the benefit of the community," but also for "debts incurred by one spouse alone exclusively for his or her own personal benefit." (*Lezine, supra,* 14 Cal.4th at p. 64.)  A spouse who has incurred debt solely for his or her own benefit "may be required to reimburse the community for the misuse of community assets . . . ." (*Ibid*.)  However, as is discussed further in part A(4), *infra*, the community estate received the entire benefit of the contract with Chamberlain -- the $12 million Chamberlain paid was used to pay off loans on the Sea View property, and the remaining cash was divided equally by the parties after the dissolution.  Accordingly, there is no basis for reimbursement.

25

'an obligation incurred by a married person . . . during marriage, whether based on contract, tort, or otherwise.' [Citation.]"].)

Here, the contractual obligation was incurred during the marriage, but the suit seeking to enforce the obligation did not commence until after the couple dissolved the marriage. As the reasoning of the *Feldner* court makes clear, this had no bearing on the community status of the liability. In *Feldner*, the husband, a contractor, entered into a contract to build -- and essentially completed -- a structure during the marriage, but failed to perform necessary repair work after the couple had separated. The husband was sued for breach of contract, and the wife contended the liability had been "'incurred'" post separation, when the husband ceased his repair efforts. (*Feldner, supra,* 40 Cal.App.4th at pp. 621-622.) The family court found the "entire liability represented by the suit was community in character," subjecting the wife to "half the potential liability from the suit," and the appellate court affirmed: "The character of the debt is clearly community because the contract giving rise to the debt was . . . 'made' during the marriage. All the consideration given (the promise to build and, if necessary, do any remedial work to make the building conform to the agreed plans) and received (the right to a lump sum payment) was exchanged before separation." (*Feldner, supra,* at p. 619, italics omitted.) Put another way, "[t]he consideration [for the contract] . . . [was] necessarily exchanged . . . [a]t the time of the exchange of promises . . . ." (*Id.* at pp. 623-624.) Because this occurred during the marriage, "there can be no doubt that the trial court was correct in determining that the character of the potential liability from the . . . lawsuit . . . was community." (*Id.* at p. 625.)

Although *Feldner* did not specifically address attorney fees or other litigation costs, the obligation of both spouses to pay their share was implicit in the court's affirmance of the trial court's ruling that the "entire liability represented by

26

the suit" was a community obligation. (*Feldner, supra,* 40 Cal.App.4th at p. 619.) An explicit holding that separated spouses are obliged to share in the costs of defending lawsuits threatening community assets can be found in *In re Marriage of Hirsch* (1989) 211 Cal.App.3d 104. There, the husband had been a member of the board of directors of a bank during the marriage, receiving remuneration which was undisputedly community property. (*Id.* at p. 106.) After the parties separated, he was named as a defendant in multiple lawsuits against the board, asserting both tort and contract claims. (*Ibid.*) He settled the lawsuits and sought reimbursement from his estranged wife for one-half the amount expended in settling, including attorney fees and costs. (*Ibid.*) The trial court denied reimbursement, finding that as the litigation was the result of the husband's "tortious conduct," its expenses should be his separate responsibility. (*Id.* at p. 108.) The Court of Appeal reversed, holding that the husband could be denied his claim for one-half the costs of the litigation only if the court found that his conduct was "intentional" *and* that there had been "no benefit to the community." (*Id.* at p. 110.) Because "even criminal or intentionally tortious conduct which results in obtaining substantial ill-gotten assets for the community creates a shared community debt," there was "no legitimate basis to characterize the settlement obligations as [the husband's] separate debt." (*Id.* at p. 111.)

The fact that the expenses of the Chamberlain litigation ordinarily would be a community obligation subject to equal division under the Family Code is, however, immaterial if such expenses were dealt with in the 2009 judgment. "'"'A property settlement agreement . . . that is not tainted by fraud or compulsion or is not in violation of the confidential relationship of the parties is valid and binding on the court'"'" even if it results in a "lopsided division of community property . . . ." (*In re Marriage of Woolsey* (2013) 220 Cal.App.4th 881, 897; accord, *Mejia*

27

*v. Reed* (2003) 31 Cal.4th 657, 666 [although family court charged with dividing couple's assets and liabilities is generally obliged to divide them equally, no law requires the couple to do so, "and the court does not scrutinize the [marital settlement agreement] to ensure that it sets out an equal division"].)  Accordingly, we turn to the issue whether the Chamberlain litigation, or any part of it, was addressed in the 2009 judgment.

> 2. *Status as an Omitted Debt Under the 2009 Judgment*
> > a. *Neither paragraph 7(g) nor 7(h) of the judgment addressed a lawsuit by Chamberlain for rescission or for claims in excess of $1 million*

Appellant contends that the possibility that Chamberlain would initiate litigation seeking rescission of the Purchase Agreement or damages in excess of the $1 million in the escrow account was not contemplated by the parties in June 2009.  Thus, no provision addressing this possibility was included in the 2009 judgment, and the amount incurred to settle Chamberlain's claims, as well as a portion of the expenses incurred litigating them, constituted an omitted obligation subject to division by the court under section 2556.  Respondent contends the final sentence of paragraph 7(h) relieves her of the obligation to share the cost of any litigation between appellant and Chamberlain, with the exception of litigation over the $1 million in the escrow account.  For the reasons discussed, we agree with appellant.

"Marital settlement agreements incorporated into a dissolution judgment are construed under the statutory rules governing the interpretations of contracts generally."  (*In re Marriage of Iberti* (1997) 55 Cal.App.4th 1434, 1439.)  The primary object of contract interpretation is to ascertain and carry out the mutual

28

intention of the parties at the time the contract was formed, determined from the writing alone, if possible. (Civ. Code, §§ 1636, 1639; *City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238; *Santisas v. Goodin* (1998) 17 Cal.4th 599, 608.) When the language of a contract is "clear, explicit, and unequivocal, and there is no ambiguity, the court will enforce the express language." (*In re Marriage of Iberti*, *supra*, 55 Cal.App.4th at p. 1440.)[32]

"The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) This means that "[c]ourts must interpret contractual language in a manner which gives force and effect to every provision" (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith* (1998) 68 Cal.App.4th 445, 473, italics omitted), and avoid constructions which would render any of its provisions or words "surplusage." (*McCarther v. Pacific Telesis Group* (2010) 48 Cal.4th 104, 110.) Put simply, "[a] contract term should not be construed to render some of its

---

[32] If the trial court finds an ambiguity (two or more reasonable interpretations of contractual language), it may receive parol evidence to aid in determining the parties' intentions. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.) When no parol evidence is introduced or when the evidence is not conflicting, "construction of the instrument is a question of law, and the appellate court will independently construe the writing." (*Id.* at p. 1166.) In other words, we defer to the trial court's interpretation of a contract only where an ambiguity exists, parol evidence is admitted, and the parol evidence is in conflict. (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351; *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 913.) Here no parol evidence was admitted. Thus, we independently interpret the parties' agreement by applying the relevant principles of contract interpretation. (*California National Bank v. Woodbridge Plaza LLC* (2008) 164 Cal.App.4th 137, 143-145.)

provisions meaningless or irrelevant." (*Estate of Petersen* (1994) 28 Cal.App.4th 1742, 1754.)

We also follow the rule that the language of a provision should be construed in context, in view of the intended function of the provision and of the contract as a whole. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265.) This may require inquiry into the circumstances under which the contract was made. (Civ. Code, § 1647; *Medical Staff of Doctors Medical Center in Modesto v. Kamil* (2005) 132 Cal.App.4th 679, 683.) "'We interpret words in a contract in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. [Citation.]'" (*Starlight Ridge South Homeowners Assn. v. Hunter-Bloor* (2009) 177 Cal.App.4th 440, 447.) When possible, courts should "'avoid an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable.'" (*ASP Properties Group, L.P. v. Fard, Inc*. (2005) 133 Cal.App.4th 1257, 1269; accord, *Barroso v. Ocwen Loan Servicing, LLC* (2012) 208 Cal.App.4th 1001, 1013.)

The two provisions of the 2009 judgment that refer to the prospect of litigation with Chamberlain are paragraphs 7(g) and 7(h). Neither their plain language nor the circumstances that prevailed when they were drafted indicate that they were intended to cover the rescission-related claims Chamberlain pursued in the Washington District Court. Paragraph 7(g) provided that the right, title and interest in any claim on the escrow funds was to be divided equally between the parties, and that the parties "shall pay the cost of pursuing such claim (including attorneys' fees) equally." The $1 million in escrow funds were part of the sale price for IEI, set aside to provide compensation to Chamberlain if it discovered a breach. In the two months preceding the entry of the 2009 judgment, Chamberlain submitted a formal written claim against the funds, contending a handful of IEI

30

products did not comply with regulations and estimating its damages and the cost of mitigation to be approximately $300,000. Thus, the parties included paragraph 7(g), covering contemplated litigation with Chamberlain over alleged breaches of contract, but limiting the scope of damages to the $1 million in the escrow account.

During the same general time frame, appellant became increasingly unhappy over Chamberlain's failure to produce and sell IEI products and generate earn-out payments. He and respondent held discussions with an attorney about pursuing a claim against Chamberlain under the earn-out provisions, but respondent wanted nothing to do with the risks associated with a claim of this type and was willing to forego any potential benefits. Paragraph 7(h) addressed the possibility that appellant would pursue a claim under the earn-out provisions of the Purchase Agreement. The first sentence specified that appellant would own "[a]ll right, title and interest" in any such claim. The second relieved respondent of any "obligation to pay all or any part of the cost of pursuing any such claim (including attorneys' fees)." The final sentence obligated appellant to "indemnify and hold respondent harmless against liability on account of any counter-claim or cross-complaint that may be filed by Chamberlain," excluding a claim covered by 7(g). Thus, by its terms, paragraph 7(h) addressed the respective rights and obligations of the parties if appellant pursued a claim against Chamberlain under the earn-out provisions, and Chamberlain was provoked into a counterclaim or cross-claim by such suit. Paragraph 7(h) said nothing about a claim or complaint initiated by Chamberlain, and did not address the possibility that Chamberlain would sue to rescind the entire contract and recoup the purchase price.

Respondent argues that the final sentence of paragraph 7(h) should be interpreted to require appellant to indemnify her for the expenses of any litigation between appellant and Chamberlain, other than that related to the escrow funds.

31

Such an interpretation effectively eliminates the prefixes in the words "counter-claim" and "cross-complaint." Moreover, it ignores the context in which the sentence appears – a paragraph dealing with the consequences of appellant's potential assertion of a claim against Chamberlain over the earn-out provisions. Taken in that context, 7(h) can reasonably be read to relieve respondent of liability only for the consequences of a claim appellant might assert under the earn-out provisions, and to which Chamberlain might respond with a cross-complaint or counterclaim. In sum, neither 7(g) nor 7(h) addressed the possibility of an action by Chamberlain to unwind the multi-million dollar Purchase Agreement.[33]

### b. *No Other Provision of the 2009 Judgment Addressed Chamberlain's Rescission-related Claims*

Respondent argues that the expenses of defending and settling Chamberlain's claims were covered by provisions of the 2009 judgment other than paragraphs 7(g) and 7(h). First, she raises paragraph 34(a), the paragraph dealing with claims between appellant and respondent in existence in June 2009, under which appellant agreed to release respondent from claims "which exist or which [appellant] may claim to exist in favor of [appellant] and against respondent with regard to or arising out of any transaction or event that occurred prior to the date of this Judgment." She asserts that in paragraph 34(b), appellant released all his claims for costs or liabilities against respondent arising out of the Purchase Agreement. We reject this argument, as appellant had no claim against respondent

---

[33]    While paragraph 7(g) did not address the costs of an action for rescission or of defending a multi-million dollar claim for damages, it did manifest the parties' intention that any reduction in the purchase price resulting from claims of defective products would be born equally by the parties.

under the Purchase Agreement. Chamberlain and appellant had potential claims against each other, which had not yet ripened into actual litigation when the 2009 judgment was executed. Appellant's claim against respondent for litigation expenses arose a month later, when Chamberlain filed the lawsuit, and appellant began paying the expenses of the litigation without contribution from respondent.

Next, respondent contends that appellant is solely responsible for the expenses of the Chamberlain litigation because under paragraph 10(f), he agreed that any community debt not provided for in the 2009 judgment would be paid by "the party who incurred such debt." As we have seen, the community "incurred" the debt by virtue of the fact that the contractual obligations arose during the marriage. (*Lezine*, *supra*, 14 Cal.4th at pp. 63-64; *Feldner*, *supra*, 40 Cal.App.4th at p. 619.)

In a similar vein, respondent points out that paragraph 10(g) provides that "[e]ach party shall pay all debts incurred by such party after the date of separation," and claims that all the attorney fees and other expenses incurred during the Chamberlain litigation fit into this category. It is true that appellant took the responsibility of hiring attorneys, ensuring they were paid, and settling the litigation, but this does not mean he alone "incurred" the obligation. A spouse or former spouse cannot transform a debt incurred by the community into separate debt by refusing to participate and forcing the other spouse to bear the entire burden of protecting the community's interest. (*In re Marriage of Hirsch*, *supra*, 211 Cal.App.3d at pp. 110-111; see also *In re Cohen* (2014) 522 B.R. 232, 241-242, 244-245 [where taxes were incurred but not paid during the marriage, fact that post-separation, husband entered into settlement with IRS without wife's participation or consent did not transform obligation into one "'incurred'" after the marriage, or exonerate the community or wife]; *Reynolds and Reynolds v.*

33

*Universal Forms, Labels*, *supra*, 965 F.Supp. at p. 1397 [innocent spouse who declined to participate in litigation over alleged misconduct that allegedly benefitted the community "cannot later contest the determinations of liability and community responsibility made in that spouse's absence"].)

Finally, respondent contends that paragraph 13(c) allocates all responsibility for the Chamberlain litigation to appellant. Paragraph 13 covers "Separate Liabilities." Paragraph 13(c) provides that "neither party has an obligation to pay any expense incurred by the other except as provided in this Judgment," and that "[u]nless the parties agree to allocate payment responsibility between themselves for an expense incurred by one of them, the expense shall be paid by the party who incurred it, who shall indemnify and hold the other party harmless against liability on account thereof." As discussed, the expenses of defending Chamberlain's claims were a community liability, not a separate one, and were incurred by the community, not by appellant separately. In sum, none of the alternate provisions raised by respondent to support her contention that appellant is solely responsible for the costs of defending Chamberlain's claims applies.


### 3. *Res Judicata*

Respondent contends that principles of res judicata preclude appellant from pursuing his claim for reimbursement of litigation expenses and settlement costs, contending the 2009 judgment was binding on issues that "could have been" raised prior to its entry. As explained in *In re Marriage of Thorne & Raccina* (2012) 203 Cal.App.4th 492, "once a marital dissolution judgment has become final, the court loses jurisdiction to modify or alter it. [Citations.] Under the doctrine of res judicata, "'[i]f a property settlement is incorporated in the divorce decree, the settlement is merged with the decree and becomes the final judicial determination

34

of the property rights of the parties.""'" (*Id*. at p. 499.)  However, there are exceptions, including the one covered by section 2556:  the trial court may divide a community property asset or liability that has not been "'previously adjudicated by a judgment in the proceeding.'" (*Id*. at pp. 500-501, quoting § 2556.)[34]  "'[T]he crucial question is whether the [asset or liability was] actually litigated and divided in the previous proceeding.'" (*Id*. at p. 501, quoting *Miller v. Miller* (1981) 117 Cal.App.3d 366, 371; accord, *In re Marriage of Georgiou & Leslie* (2013) 218 Cal.App.4th 561, 575.)  "The mere mention of an asset in the judgment is not controlling." (*In re Marriage of Thorne & Raccina*, *supra*, 203 Cal.App.4th at p. 501.)[35]

Here, for the reasons discussed, we conclude the obligations deriving from the Chamberlain-initiated rescission claim were not addressed in the 2009

---

[34]  The rule that division of a community asset or liability is not precluded by collateral estoppel or res judicata merely because it could have been disposed of in a prior judgment of dissolution predates the enactment of section 2556.  (See *Henn v. Henn* (1980) 26 Cal.3d 323, 331, fn. 6 [disapproving proposition that "any judicial division of community property necessarily precluded the subsequent litigation of community property rights in an asset known to exist at the time of the earlier proceedings, and which could have been adjudicated at that time"].)

[35]  *In re Marriage of Mason* (1996) 46 Cal.App.4th 1025, on which respondent relies, is inapposite.  In *Mason*, the husband moved to set aside a stipulated dissolution judgment on the ground of fraud, contending the wife had concealed the fact that she was planning to reopen a business she had closed prior to the divorce.  After the motion was denied, the husband filed an order to show cause, contending for the first time that the value of the goodwill of the wife's business was an omitted asset under section 2556.  The Court of Appeal held that all issues pertinent to the wife's business should have been raised when the husband first moved to set aside the judgment.  The court did not suggest the dissolution judgment itself operated as a bar.

judgment. Accordingly, the doctrine of res judicata does not preclude appellant's claim for a share of the expense of defending and settling the litigation.

### 4. *Unclean Hands*

Section 2556 provides that the court "shall equally divide the omitted or unadjudicated community estate asset or liability," unless it "finds upon good cause that the interests of justice require an unequal division of the asset or liability." Respondent contends that she should escape all liability for the expenses of the Chamberlain litigation under section 2556 because appellant has "'unclean hands.'" The facts on which respondent relies, however, would not permit the court to impose on appellant the entire obligation of defending and settling Chamberlain's claims.

Respondent asserts that she "was not a shareholder, officer, director or employee of IEI and had no involvement in the business," that she "did not participate in the sale or the negotiation of the sale," that she "did not sign the [Purchase Agreement]," that she was unaware that appellant "had falsely represented to Chamberlain [in the Purchase Agreement] that all of IEI's products were compliant with all laws and regulations," and that appellant "had far more knowledge about the potential Chamberlain Litigation than [she]." She contends appellant's conduct in "illegally manipulating and selling his products in violation of FCC regulations . . . is substantial evidence of good cause to support the trial court's finding that all of the Chamberlain Litigation liabilities and expenses should be allocated to [appellant]."[36]

---

[36] The court below found that appellant "did not disclose to Chamberl[a]in that IEI products were not in compliance with federal standards and regulations; and he

*(Fn. continued on next page.)*

The fact that a spouse has intentionally engaged in misconduct that harms a third party without his or her spouse's knowledge does not relieve the community -- or the innocent spouse's share of community assets -- from the obligation to the third party where the community obtained the benefit of the conduct. (See, e.g., *In re Marriage of Hirsch*, *supra*, 211 Cal.App.3d at p. 111 [criminal or tortious conduct which results in benefit to the community creates "shared community debt"]; *In re Marriage of Bell* (1996) 49 Cal.App.4th 300, 310 [at time of dissolution and division of community assets, equal share of the cost of reimbursing victim of wife's embezzlement fell on husband, where "there was uncontradicted testimony that the community received the benefit of the embezzlement"]; see also *In re Marriage of Schultz* (1980) 105 Cal.App.3d 846, 855-856 [husband's negligent failure to appear in court to defend action brought by creditor, resulting in default judgment, did not "require[] an unequal division of the . . . debt"], *id*. at p. 855; § 910, subd. (a).) Assuming the truth of the allegations that appellant deliberately misrepresented the status of IEI's products, his doing so necessarily furthered the goal of selling the company to Chamberlain for the agreed price. Thus, his actions benefitted the community and the obligations that derived from them cannot be unequally divided by the court on that basis.

Respondent contends we should follow *In re Marriage of Stitt* (1983) 147 Cal.App.3d 579. *Stitt* is distinguishable. There, the wife, after being convicted of embezzlement, was sued for fraud and misappropriation of funds. She paid over $10,000 in attorney fees to defend herself and to reimburse the wronged party. (*Id*.

attempted to hide this information from Chamberl[a]in." The court also found that appellant "withheld information from [respondent] concerning IEI's noncompliance with federal regulations regarding the radio frequency limitations."

at p. 584.) She argued these expenses should be regarded as community debt. (*Id.* at p. 586.) However, she presented "no evidence the embezzlement jointly benefited husband and wife." (*Ibid.*) Because the husband did not participate in the embezzlement and no benefit to the community was shown, the court concluded "[n]o principle of law required the innocent spouse to share the loss created by the [other]." (*Id.* at p. 588.) Here, there was a clear benefit to the community. Respondent and appellant received over $12 million from the sale of IEI, the bulk of which went into the Sea View property. They split $1.5 million at the time of separation, and the Sea View property sold for $8.7 million in 2013. The principle we follow was set forth in *In re Marriage of Bell*, where the wife used the embezzled funds for the benefit of the community: "The community . . . shared in the benefit and could properly be asked to share in the cost." (*In re Marriage of Bell, supra,* 49 Cal.App.4th at p. 310.)

### B. *Cost of Settlement*

Our conclusion that the liability arising out of Chamberlain's claims was a community obligation omitted from the 2009 judgment requires us to reverse the court's conclusion that respondent had no obligation to contribute her share of the $2 million settlement. The court's finding that respondent was relieved of the obligation because appellant settled with Chamberlain without including respondent or the community in the settlement or release misconstrues the effect of the settlement. Appellant's actions were the conduit through which Chamberlain could assert a claim on community funds, including those held by respondent. Having settled its claims against appellant and received payment of the amount due, Chamberlain had no basis to pursue respondent or the community. (See *Reynolds and Reynolds v. Universal Forms, Labels*, *supra*, 965 F.Supp. at

pp. 1395-1397 [although judgment against spouse acting for benefit of the community binds community estate and his separate property, innocent spouse has no personal liability].)

C. *Attorney Fees and Costs*

1. *Fees in the Chamberlain Litigation*

Our conclusion does not, however, resolve respondent's obligation to pay a share of the attorney fees and costs arising from that litigation. Although the court concluded that paragraph 7(h) assigned all the fees and costs of the Chamberlain litigation -- including the cost of defending Chamberlain's rescission-related claims -- to appellant, it rejected appellant's fee request on an alternative ground. It found that appellant's reimbursable fees and costs could not include the expenses of pursuing his earn-out counterclaim under any interpretation of the 2009 judgment, and that appellant failed to meet his burden of establishing the amount of his reimbursable fees and costs. We agree.

Appellant concedes the court was correct to describe the billing entries at issue as "block billing." He further concedes that the court "correctly said that [respondent] would not be responsible for any . . . fees incurred in working against her interests," and that appellant's own attempt to allocate fees between allowed and disallowed claims was "too speculative to be valuable . . . ." He contends, however, that substantial evidence to support his claim for attorney fees can be derived from (1) Beighle's testimony that "probably 50 percent to 75 percent" or "more" of the billed time was devoted to whether "Chamberlain had a right to obtain the escrow money"; and (2) respondent's spreadsheet, in which she attempted to identify billing entries reflecting work on issues not pertinent to defending Chamberlain's claims. We disagree.

39

Preliminarily, we observe that appellant has directed us to nothing in the record demonstrating that he urged the trial court to allocate between reimbursable and unreimbursable fees based on Beighle's estimation or respondent's spreadsheet. "'As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried . . . . [I]t would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal.'" (*P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1344, quoting Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2009) ¶ 8.229, p. 8-155 (rev. #1, 2009).)

More important, the court's conclusion is supported by the principles governing the scope of evidence necessary to support a fee award, especially where block billing is involved. "[T]he [party] . . . seeking fees and costs '"bear[s] the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." [Citation.]'" (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1320.) "'To that end, the court may require [a] defendant[] to produce records sufficient to provide "'a proper basis for determining how much time was spent on particular claims.'" [Citation.]'" (*Ibid.*) "The evidence should allow the court to consider whether the case was overstaffed, how much time the attorneys spent on particular claims, and whether the hours were reasonably expended. [Citation.]" (*Ibid.*) "'The court . . . may properly reduce compensation on account of any failure to maintain appropriate time records. [Citation.]'" (*Ibid.*)

Block billing presents a particular problem for a court seeking to allocate between reimbursable and unreimbursable fees, and trial courts are granted discretion "to penalize [block billing] when the practice prevents them from

40

discerning which tasks are compensable and which are not." (*Heritage Pacific Financial, LLC v. Monroy, supra,* 215 Cal.App.4th at p. 1010; accord, *Welch v. Metropolitan Life Ins. Co.* (9th Cir. 2007) 480 F.3d 942, 948 ["The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked. [Citation.] It was reasonable for the district court to conclude that [the applicant] failed to carry her burden, because block billing makes it more difficult to determine how much time was spent on particular activities"].) "If counsel cannot . . . define his billing entries so as to meaningfully enlighten the court of those related to the [fee claim]," the trial court may "exercise its discretion in assigning a reasonable percentage to the entries," or "simply cast them aside." (*Bell v. Vista Unified Sch. Dist.* (2000) 82 Cal.App.4th 672, 689.)

It also is true that when a fee claim is inflated with "a multitude of time entries" devoted to matters other than reimbursable fees, the claimant's credibility is "undermin[ed]," and the court is "justified . . . in taking a jaundiced view of the fee request." (*Christian Research Institute v. Alnor*, *supra*, 165 Cal.App.4th at p. 1325.) "An attorney's chief asset in submitting a fee request is his or her credibility, and where vague, blockbilled time entries inflated with noncompensable hours destroy an attorney's credibility with the trial court, we have no power on appeal to restore it." (*Id*. at pp. 1325-1326.)

In its February 2010 order, the court found that the liabilities of the parties "with respect to the action for rescission and other related relief" filed by Chamberlain against appellant in the Washington district court constituted an undisposed of obligation under the 2009 judgment; it specifically rejected appellant's contention that <u>all</u> the costs of the litigation fell into this category. Appellant thus had both notice and incentive to come to the evidentiary hearing

41

prepared to address allocation. Instead, he claimed entitlement to one-half of all the attorney fees he paid to Beighle's firm, although Beighle himself acknowledged substantial time was spent pursuing the earn-out counterclaim. Moreover, even a cursory look at the bills established that the firm had spent significant time on matters personal to appellant or contrary to respondent's interests. Appellant undertook at the last minute to fill in the gap in the evidence by personally reviewing the bills and preparing an exhibit summarizing them, but the court found his methods questionable and gave no credence to his testimony or the exhibit he prepared.

On appeal, appellant does not dispute the court's conclusion that the evidence he presented was of little value in resolving the attorney fee allocation issue. The evidence he now claims the court should have relied on does not fill in the gaps. With respect to Beighle's estimate, "[t]he trial court is not bound by an attorney's evidence in support of his requested fee." (*Vella v. Hudgins* (1984) 151 Cal.App.3d 515, 524.) Beighle repeatedly testified to his belief that all fees billed by his firm should be shared between appellant and respondent. Not only had he made no effort to identify entries related to the earn-out counterclaim, he failed to separate out time spent on matters unrelated to the litigation or adverse to respondent. Nor was there any evidence he had reviewed the bills in preparation for his testimony or even thought about allocation. Looked at in the context of his testimony as a whole, his offhand statement that "probably 50 percent or 75 percent" or "more" was spent on "whether or not Chamberlain had a right to obtain the escrow money" did not represent a reasoned conclusion concerning the amount of time devoted to defending Chamberlain's affirmative claims to which the court was required to give credence.

42

We also reject appellant's alternative contention that the spreadsheet prepared by respondent was sufficient to support an award. Respondent, a lay person unfamiliar with the Washington litigation or the billing records, relied on appellant's documents to discredit his claim. Her review of the records attempted to identify work done on matters adverse to her interest, unrelated to the Chamberlain litigation or labeled as relating to the counterclaim. Such a review could not substitute for an adequate breakdown of the time spent on Chamberlain's rescission-related claims. In sum, neither Beighle's estimation nor respondent's spreadsheet made up for the shortfall's in appellant's evidentiary presentation, and the trial court did not err in rejecting the attorney fees claim for lack of evidence.

## 2. *Fees in the Underlying Proceedings*

The trial court determined that the costs of the instant litigation were governed by paragraph 38(b) of the 2009 judgment, which called for an award of attorney fees and costs to the prevailing party in any proceeding brought "to interpret or enforce any of the provisions of this Judgment." We reject appellant's argument that the proceedings below did not represent an effort to "'interpret or enforce'" the judgment because "an omitted debt is outside the Judgment." His motion under section 2556 required the court to interpret the 2009 judgment, particularly paragraphs 7(g) and 7(h), to determine whether the Chamberlain litigation, or any part of it, fell under its terms. Where the litigation centers on the proper interpretation of a contract containing an attorney fee provision, a party is entitled to attorney fees as prevailing party under Civil Code section 1717 "'even when the party prevails on grounds the contract is inapplicable . . . .'" (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 870.) Moreover, the court found, contrary to appellant's assertion, that fees incurred to pursue his earn-out counterclaim were

43

included in the judgment and therefore were not allocable to respondent. Accordingly, there is no question that the underlying litigation interpreted and enforced the judgment, allowing the court discretion to award attorney fees under the contractual attorney fee provision.

Nevertheless, our conclusion that appellant is entitled to recover from respondent one-half the additional one million dollars he paid Chamberlain requires reversal of the court's award of attorney fees to respondent under the attorney fee provision of the 2009 judgment, and to remand for reconsideration of the identity of the prevailing party, if any. (See *Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109 ["If neither party achieves a complete victory on all the contract claims, it is within the discretion of the trial court to determine which party prevailed on the contract or whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees"]; *Hsu v. Abbara, supra,* 9 Cal.4th at p. 876 ["[I]n deciding whether there is a 'party prevailing on the contract,' the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources. The prevailing party determination is to be made only upon final resolution of the contract claims and only by 'a comparison of the extent to which each party ha[s] succeeded and failed to succeed in its contentions'"].)

**DISPOSITION**

The court's order of September 10, 2014 is reversed with respect to its denial of reimbursement for one-half the settlement funds appellant paid Chamberlain. In all other respects, the order is affirmed. The court's order of November 17, 2014, awarding attorney fees to respondent is reversed. The matter is remanded for entry of an order requiring respondent to reimburse appellant one-half the settlement paid to Chamberlain from appellant's individual funds, and for reconsideration of attorney fees in the family court proceeding. Each party is to bear his or her own costs.

**CERTIFIED FOR PUBLICATION**

MANELLA, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.

45