[No. G014234. Fourth Dist., Div. Three. Nov. 28, 1995.]

In re the Marriage of WILLIAM J. and CELENA RUTH FELDNER.
WILLIAM J. FELDNER, Respondent, v.
CELENA RUTH FELDNER, Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of section of the opinion entitled "MISCELLANEOUS ISSUES."

## COUNSEL

Ronald W. Weiss and Stuart Knight for Appellant.

Richard L. Keller for Respondent.

## OPINION

**SILLS, P. J.—**

### INTRODUCTION

Community property is liable for debts incurred by either spouse during marriage. (Fam. Code, § 910, formerly Civ. Code, § 5120.110, subd. (a).) But exactly when is a debt "incurred"? The Family Code provides that "[i]n the case of a contract," it is "at the time the contract is made." (Fam. Code, § 903, formerly Civ. Code, § 5120.040.)

So what does it mean to "make" a contract when performance extends over a period of time which spans a marital breakup? In the present case a contractor completed a building during the marriage, but the structure was allegedly defective and required work after the contractor separated from his wife. The building contractor failed to do that work and was sued, in part, for his failure. In the building contractor's divorce case, the family court declared the entire liability represented by the suit was community in character. The wife, now stuck with half the potential liability from the suit, claims the family court erred. Did it?

No. The *character* of the debt is clearly community because the contract giving rise to the debt was, indeed, "made" during the marriage. All the consideration given (the *promise* to build and, if necessary, do any remedial work to make the building conform to the agreed plans) and received (the *right* to a lump sum payment) was exchanged before separation.

What about the postseparation work necessary under the contract or a postseparation decision by one spouse that may contribute to the community's liability? These questions are answered by the well-established family

law principles of credit and reimbursement. Spouses are entitled to a credit when they use their separate property to preserve community assets; the community is entitled to a reimbursement when separate wrongful acts diminish the community estate. Here, the building contractor husband did not ask for credit for the value of his postseparation remedial work and the wife did not request reimbursement on behalf of the community for any portion of liability attributable to the husband's postseparation decision to discontinue that remedial work. Thus on this record the judgment must be affirmed.

## FACTS

William J. and Celena Ruth Feldner were married in 1954 and separated in April 1989. During that time William worked as a building contractor.

Their dissolution came to trial in February 1992. One of the issues was how to characterize a lawsuit filed against William in October 1990 and still pending, entitled Allen v. Feldner (Super. Ct. Orange County, 1990, No. 640448).

There was only sparse testimony or other evidence at the dissolution trial concerning the Allen lawsuit. Almost all of it came from William.[1]

On direct examination William testified he built a home for Daniel and Corrine Allen, acting "as a superintendent." He used the income from the job to pay community debts. He testified the lawsuit resulted from "whatever efforts [he] did on that home" and the Allens were challenging "whatever moneys [he] earned on that home."

On cross-examination William testified the Allen lawsuit alleged that on July 15, 1989—i.e., after the date of separation—he "refused to do work" and that on October 26, 1990 (again, after separation) the Allens "believe[d] [William] breached the implied warranty." However, when Celena's counsel put it to him that he had "created" the litigation "by refusing to do the work to their [the Allens'] satisfaction," William answered no.

Redirect examination revealed that William "commenc[ed] assisting the Allens in building that house" in 1988. By July 15, 1989, the Allens had "run out of money," were "no longer paying the subs or [William]" and he "refused to complete it [presumably the house] on that ground." William further testified the Allens "had made extensive changes" to their house and "overran the anticipated cost."

---

[1] A copy of the complaint, for example, was not received into evidence, nor was any request made to take judicial notice of it.

William then testified he was working only as a "supervisor on behalf of the Allens." The Allens paid William a "salary" until his "salary" was "exhausted" in the "latter part of '88." He also said that he "regularly supplied" Celena—at least "on occasions"—with money from "any sums that [he] had gotten after he separated."

For her part Celena testified that William gave her very little information about the various lawsuits that were filed against him; generally speaking, William would say that they were "his responsibility," and would tell Celena that it was "none of [her] business" when asked about them. Then again, William testified that Celena was "reasonably familiar with the Allen lawsuit."

The trial judge found the Allen lawsuit was a community obligation incurred during the marriage and declared each party equally obligated with respect to any negative result and equally entitled to any positive result.

In July 1992, before any formal final judgment had been filed, Celena filed a motion for reconsideration, to which she attached the written findings of a court-appointed referee in the Allen suit. The referee's findings shed more light on the nature of the Allen transaction.

The referee's findings—actually a formal written opinion about the case—recounted that William worked with the Allens for over four years planning the Allens' new home. William received no compensation for this work because, as the referee noted, building contractors typically provide "pre-construction support to gain the construction contract." William then orally agreed to build a " 'turn-key' " home in return "for a specific lump sum amount."

The only written documentation of the arrangement was a note signed in May 1988 for $35,000 to insure William's fee for the project. William never submitted time cards, had no payroll deductions and never requested personal coverage for workers' compensation insurance. He signed contracts with subcontractors directly.

According to the referee, the evidence showed that William breached the contract in four ways: He did not complete the project in time; he did not complete all the work as defined in the plans; he failed to "provide corrective and remedial work"; and he did not include specific items, otherwise called for in the plans, in the finished home.

The referee's opinion also revealed why William had characterized himself as a mere "superintendent" at the dissolution trial: One of the major

issues in the Allen lawsuit was whether William was a general contractor or an employee. The referee concluded he was a general contractor, noting his prior work as a building contractor; the lump sum payment; and the failure to submit time cards, request personal workers' compensation coverage or have any payroll deductions made. The referee determined that while it was true the Allens signed for their building permit as owner-builders, that was a "marginally correct practice" done to avoid the cost of a city business license.

The family law judge denied the motion for reconsideration. A formal judgment was finally filed in March 1993. Celena's notice of appeal from the portion of the judgment declaring the Allen lawsuit to be a community obligation was filed in May 1993, less than 60 days later.

### BECAUSE THE CONSIDERATION WAS EXCHANGED DURING THE MARRIAGE, THE CONTRACT DEBT WAS COMMUNITY IN CHARACTER

■ Celena contends that because the potential Allen liability was "incurred" by William's postseparation act of intentionally quitting his job as a "superintendent," the resulting debt was necessarily his alone. She reasons that just as any earnings from William's postseparation efforts would be his separate property, so should the liability incurred for discontinuing such efforts.

The argument forces us to examine Family Code section 903, which, as mentioned above, provides that "[i]n the case of a contract," a "debt" is "incurred . . . at the time the contract is made."[2] Surprisingly enough, the statute (and its predecessor, Civil Code section 5120.040) has received virtually no judicial attention.

As written, section 903 is oblivious to the time of *performance* of a contract. The statute does not say that a contract debt is incurred when a contract is broken, or incurred when it is to be substantially performed, or anything like that. It says that a contract debt is "incurred" when the contract is "made." When read together with section 910, subdivision (a) ["Except as otherwise expressly provided by statute, the community estate is liable for a debt incurred by either spouse before or during marriage . . . ."] the effect of section 903 is to characterize contract debts as community when the contract is "made" (as distinct from performed) during the marriage.

---

[2]The exact text of section 903 is: "A debt is 'incurred' at the following time: [¶] (a) In the case of a contract, at the time the contract is made. [¶] (b) In the case of a tort, at the time the tort occurs. [¶] (c) In other cases, at the time the obligation arises."

Unless otherwise specifically indicated, all statutory references are to the Family Code.

At first blush, the disregard for performance seems counterintuitive, if not downright unfair in a context such as the present case where performance may extend into the postseparation period. Here, for example, making Celena half responsible for the liability represented by the Allen lawsuit means she may wind up bearing a burden partially created by William's postseparation decision to discontinue remedial services, in apparent contradiction of section 2623, subdivision (b) (debts incurred by spouse for nonnecessaries shall be "confirmed without offset" to that spouse). Moreover, application of the rule in circumstances like those here can violate the principle that no one should suffer by the act of another (Civ. Code, § 3520; cf. *In re Marriage of Stitt* (1983) 147 Cal.App.3d 579, 588 [195 Cal.Rptr. 172] [excusing a husband from the attorneys fees incurred in connection with the wife's embezzlement]), in particular a wrongful act that does not benefit the marital community (see *Stitt, supra,* 147 Cal.App.3d at pp. 587-588; see also § 1000, subd. (b)(2) [tort liability of married person incurred in activity not for benefit of community must be satisfied first from person's separate property]). Making Celena half responsible also seems contrary to the basic rule that the marital community is not responsible for postseparation debts. (Cf. § 903.)[3]

On closer reflection, however, the statutory when-the-contract-is-made test, when combined with the possibility of credit and reimbursement for postseparation contributions, establishes a reasonable symmetry.[4] (See generally § 2626 ["court has jurisdiction to order reimbursement in cases it deems appropriate for debts paid after separation but before trial"]; *In re Marriage of Epstein, supra,* 24 Cal.3d at pp. 82-86 [spouse entitled to reimbursement for separate funds spent to preserve community residence unless paid to discharge duty of support]; see also § 914, subd. (b) [married person entitled to reimbursement for applying separate property to satisfaction of certain debts incurred by spouse, to the extent nonexempt community property or spouse's separate property is available].) The determination of the *character* of a debt, like that of the character of an asset, is a different issue than a spouse's right to reimbursement or credit because of postseparation conduct.

A contract is, after all, only an exchange of promises. The consideration, as distinct from the performance, is necessarily exchanged at a fixed time. At

---

[3]While William testified that he did not "create" the Allen litigation by his postseparation refusal to do remedial work, the referee's opinion certainly indicates that a *portion* of the liability resulting from the litigation was "created" by that refusal.

[4]Compare *In re Marriage of Epstein* (1979) 24 Cal.3d 76 [154 Cal.Rptr. 413, 592 P.2d 1165] (right of reimbursement for separate payments made to preserve community asset) with *In re Marriage of Watts* (1985) 171 Cal.App.3d 366 [217 Cal.Rptr. 301] (right of reimbursement on part of community for value of exclusive use of community asset).

the time of the exchange of promises, *all* the consideration either flows to or from a given person or marital community.

The *performance* of a contract, however, is fundamentally different from the problem of determining its community or separate character. Many contracts, such as an installment debt, require extended periods of performance. ■ The classic solution to the problem created by a separation date during such an extended period is to allow for reimbursement by the spouse who uses his or her postseparation earnings to pay a "preexisting" community obligation. (See *In re Marriage of Epstein, supra*, 24 Cal.3d at p. 84; see also § 2626.)[5]

The same holds true for the *destruction* or *forfeiture* of community assets by one spouse during the postseparation period. (*In re Marriage of Beltran* (1986) 183 Cal.App.3d 292, 295 [227 Cal.Rptr. 924]; see also *In re Marriage of Stitt, supra*, 147 Cal.App.3d 579.) In such cases, the spouse whose "separate conduct" creates the loss can be required to reimburse the community.[6]

However, just because a spouse may have a right to request reimbursement does not mean the family law court has a sua sponte duty to consider the possibility. With regard to the use of postseparation earnings to, in effect,

---

[5]Of course, reimbursement is not appropriate when paying the community obligation amounts to discharging a duty of support (e.g., *In re Marriage of Garcia* (1990) 224 Cal.App.3d 885 [274 Cal.Rptr. 194] [because wife made mortgage payments which husband should have made in discharge of his duty of support, it was error to require wife to reimburse community for rental value of house in which she lived after separation] or when the paying spouse is using the asset and the amount paid does not exceed the rental value of the asset, e.g., *In re Marriage of Green* (1989) 213 Cal.App.3d 14, 22 [261 Cal.Rptr. 294] [there is an exception to rule of reimbursement when paying spouse uses asset and amount paid does not substantially exceed value of use]; *In re Marriage of Tucker* (1983) 141 Cal.App.3d 128 [190 Cal.Rptr. 127] [no reimbursement because one spouse's payments on community refrigerator did not substantially exceed use value]).

[6]In *Beltran* the husband, an Army Colonel, was convicted of child molestation by a military tribunal. As a result, he was dismissed from the service and stripped of his military pension, a portion of which was community property. The appellate court's opinion is unclear whether the actual criminal acts were committed prior to the couple's separation, but leaves no doubt that the conduct was fundamentally "separate." (*In re Marriage of Beltran, supra*, 183 Cal.App.3d at p. 295, original italics, fn. omitted ["As we read *Stitt*, it was the wife's separate *conduct* which led the court to hold her personally responsible for the loss. The *Stitt* reasoning seems equally applicable whether the loss was incurred by contractual obligation, tort liability or criminal penalty."].) Hence the appellate court affirmed the trial court's decision to charge the husband with the full amount of community property his conduct had caused to be lost, in effect reimbursing the community for the loss.

If the conduct in *Beltran*, which might have actually taken place during the marriage, required reimbursement because it resulted in the forfeiture of community property, then, a fortiori, conduct that definitely took place after separation that results in the forfeiture of community property also necessitates reimbursement.

preserve a community asset (§ 2626—*Epstein* situation), reimbursement is not automatic, but involves the consideration of such a variety of factors (see Hogoboom & King, Cal. Practice Guide: Family Law 1 (The Rutter Group 1995) ¶¶ 8:845-8:849, pp. 8-200-8-202 (Hogoboom & King) [whether there was an agreement, whether the use of the postseparation earnings was intended as a gift, the rental value of the asset to the paying spouse, whether the payments represented a duty of support]) that the onus must necessarily be on the paying spouse to specifically request reimbursement. Further, even reimbursement under section 2640 (establishing right of reimbursement for separate property contributions to the acquisition of community property, including payments that reduce loan principal) requires the paying spouse to *trace* contributions to a separate property source. If the paying spouse simply sits back and does nothing, there will be no reimbursement.

Likewise, reimbursement to the community for losses caused by separate conduct of one spouse (the *Stitt-Beltran* situation) also necessarily requires an affirmative showing. As this court observed in *In re Marriage of Hirsch* (1989) 211 Cal.App.3d 104, 110-111 [259 Cal.Rptr. 39], to be reimbursable, the conduct which exposes the community to loss cannot be just negligent, but intentional.[7] The mere negligent conduct of a spouse that benefits the community is insufficient to make any debt arising out of that conduct separate. (*Id.* at p. 110.) From this we may deduce that the burden of proving intentional conduct not benefiting the community must necessarily fall on the aggrieved spouse. (See also § 920 [rights of reimbursement provided by statutes dealing with liability of marital property must be exercised not later than court-ordered division of that property].) It is not enough for a spouse to expect the family court to raise the possibility on its own.

We may now apply these basic rules to the instant case. First, there can be no doubt that the trial court was correct in determining that the character of the potential liability from the Allen lawsuit—including the potential liability arising from the failure to perform corrective services in the postseparation period—was community. The entire contract was "made" during the marriage: It was *then* that the community estate acquired the *right* to receive payment from the Allens for building their home and became obligated to perform the contract by building a home according to certain plans and specifications.

Second, William might have made a request for reimbursement from the community for the value of his postseparation services necessary to complete the performance owed by the community to the Allens. He did not, and

---

[7]Compare *In re Marriage of Beltran, supra,* 183 Cal.App.3d 292 (child molestation was separate conduct) with *J. C. Penney Casualty Ins. Co.* v. *M. K.* (1991) 52 Cal.3d 1009, 1026 [278 Cal.Rptr. 64, 804 P.2d 689] (nature of child molestation is such that perpetrator necessarily intends harm to victim).

thereby waived any right to the value of the postseparation services he performed.

Likewise, Celena might have made a request on behalf of the community for reimbursement of that portion of the potential liability to the Allens represented solely by William's failure to perform postseparation services.[8] Celena made no request for reimbursement, or even for reservation of jurisdiction over the Allen liability.[9] As related above, the trial court was under no sua sponte duty to raise the issue for her. Thus, as to the Allen lawsuit, the family law court only had the characterization issue before it. As to that issue, the court was correct on the record before us.

---

[8]Because the underlying Allen liability had not been fully adjudicated by the time of the trial in the family law case, a reimbursement request necessarily would have entailed a collateral request that the family court reserve jurisdiction over the amount that would be reimbursable. After all, the precise portion of any judgment in the Allen case attributable solely to William's postseparation decision to discontinue "remedial and corrective work" had not been finally determined. We do not see any obstacle to such a reservation. Section 2550 allows the court to expressly reserve jurisdiction over a property division. (See also Hogoboom & King, *supra*, ¶ 8: 640, p. 8-154 ["Family courts have 'continuing jurisdiction' to entertain postjudgment motions or OSCs to divide assets and debts left unadjudicated by a prior dissolution judgment"], ¶ 8:1500, p. 8-354 ["it has always been the law that, so long as jurisdiction has been reserved, property rights not adjudicated by the judgment can be disposed of in a later proceeding in the same case"].)

Further, while it is true that section 920 limits the "exercise" of the *statutory* rights of reimbursement set forth in part 3 of division 4 of the Family Code to the proceedings to divide the community estate on marriage dissolution (see Hogoboom & King, *supra*, ¶ 8:803, p. 8-189 ["a property division proceeding is the claimant spouse's *last chance* to make a § 900 et seq. reimbursement claim"]), the statute does not preclude reservation of jurisdiction over a request for reimbursement based on potential community liability for a postseparation act. The right of the community to seek such reimbursement is grounded in equity (see *In re Marriage of Beltran, supra*, 183 Cal.App.3d at p. 295 ["We accordingly conclude as a matter of equity . . . ."]; see also *In re Marriage of Stitt, supra*, 147 Cal.App.3d at p. 588 ["the court could seek an equitable result because of the separate nature of the obligation . . . ."]), not one of the specific reimbursement statutes enumerated in part 3 of division 4.

Moreover, even if such an obligation were statutory, section 920 could not operate as a time bar against reimbursement claims that could not, by their very nature, arise until after dissolution proceedings. In discussing the statutory right under section 916 (which gives a spouse the right to seek reimbursement if his or her separate property or share of community property is applied to satisfy a judgment for a debt assigned to the other spouse), Hogoboom and King sensibly point out that section 920 "necessarily cannot operate" to bar the right, even though it is untimely under a literal application of the statute. (Hogoboom & King, *supra*, ¶ 8:810, p. 8-191 ["Curiously, however, a § 916, subd. (b) reimbursement claim cannot *arise* until *after* the property division assigning the debt to the nondebtor spouse and its subsequent satisfaction against the debtor spouse. Consequently, the § 920, subd. (b) property division time bar necessarily cannot operate with regard to § 916, subd. (b) reimbursement claims."].)

[9]The appellate record discloses no trial brief filed by Celena, an absence of any mention of the Allen lawsuit in her pretrial property declaration, and no requests for reimbursement or retention of jurisdiction in either her closing argument or motion to reconsider. The latter was framed in only the most general terms. In her notice of motion, she merely quoted the family law court's order and asked that the "court reconsider" that ruling.

One issue, however, must be dealt with further in the context of characterizing debt based on contract: emotional distress damages. The referee in the Allen lawsuit was of the opinion that emotional distress damages of $43,500 should be awarded, measured by the difference between the amount the Allens should have reasonably expected to pay for their house with all the extras ($616,500) and the amount they actually did pay, exclusive of any damages ($660,000). In her motion for reconsideration, Celena specifically pointed to the emotional distress award and asserted that at least it should be charged to William, because (according to her) it was based on William's "action after the date of separation."[10]

Emotional distress damages for liability based on *contract* do not readily "fit" into a consideration model for the time a contract debt is incurred under section 903 because, from the community's point of view, nothing the community received by way of consideration for its promises corresponds with the emotional distress for which it might have to pay. With a typical contract debt, the community receives the consideration initially given for the contract, so there is justice in holding the community responsible for its part of the bargain. Here, for example, *all* the money William was paid by the Allens was community property used during the marriage. But unlike the tidy symmetry inherent in allowing reimbursement for the use of postseparation separate property to preserve a community asset (as in *In re Marriage of Epstein, supra,* 24 Cal.3d 76), emotional distress damages based on wrongful separate conduct (as in *In re Marriage of Beltran, supra,* 183 Cal.App.3d 292) represent an asymmetric net loss to the community.

The answer is to call a tort a tort. Despite the referee's inclinations in the underlying suit brought by the Allens,[11] emotional distress damages are, fundamentally, a species of tort damages not recoverable in contract actions. (E.g., *Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515 [28 Cal.Rptr.2d 475, 869 P.2d 454] ["consequential damages beyond the expectations of the parties are not recoverable" in contract]; see generally *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373].)

Even in the context of insurance contracts, where emotional distress damages have been allowed (e.g., *Comunale* v. *Traders & General Ins. Co.*

---

[10]The referee's opinion does not appear to bear her out, as it bases the award on the Allens' damage as a whole, not just on the incremental value of the postseparation discontinuance of the remedial work.

[11]We would observe, in this regard, that what the referee described as emotional distress damages appears in substance to be contract damages, i.e., the difference between what the Allens bargained for (a house worth $616,500) and what they had to spend to get it ($660,000).

(1958) 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883] [insurance bad faith]), they retain their character as *tort*—not contract—damages. (*Murphy v. Allstate Ins. Co.* (1978) 83 Cal.App.3d 38, 48 [147 Cal.Rptr. 565] [duty of good faith and fair dealing "is not strictly a contractual obligation" but, rather, one "imposed by law"].) The possible presence, therefore, of emotional distress damages in the Allen suit does not affect the community character of the *contract* damages. Either party might have requested the family court to retain jurisdiction to determine whether a part of the losses in the Allen action should be characterized as tort damages, and either separate or community, depending on when the tort occurred (see § 903, subd. (b) [tort debts are incurred at the time the tort occurs]). But neither did. William merely presented some evidence in his case in chief that the basis of any liability to the Allens was contractual. Celena presented nothing to rebut, limit, or qualify that showing. Nor did Celena present any such evidence in her motion for reconsideration. The referee did not specifically identify William's postseparation decision to discontinue remedial work as a discrete basis for the assessment of tort damages for emotional distress or otherwise. Indeed, if anything, the referee's opinion suggested the core of any award for emotional distress was William's failure to deliver a house to the Allens in the time and according to the specifications agreed—events which were entirely preseparation. And, as we have already noted, Celena did not make any request for the family law court to retain jurisdiction over the issue. Thus again the record discloses no error on the part of that court.

Finally, and along the lines of our discussion of potential tort liability, Celena did not make any attempt to show the Allen lawsuit represented actions so wrongful and without benefit to the community that any ensuing liability should be allocated to William on that basis. (See *In re Marriage of Stitt, supra,* 147 Cal.App.3d 579 [liability for wife's embezzlement properly assigned solely to her where no benefit to community was shown]; see also *In re Marriage of Hirsch, supra,* 211 Cal.App.3d 104 [no charge against spouse where tortious conduct was merely negligent and *was* beneficial to community]; *In re Marriage of Partridge* (1990) 226 Cal.App.3d 120, 126-127 [276 Cal.Rptr. 8] [husband voluntarily shouldered penalties incurred by his own failure to pay a large tax liability].)[12] And in light of this record, it is unlikely she could have. As mentioned above, there is no dispute the community got the benefit of the contract with the Allens.

---

[12]In *In re Marriage of Hirsch, supra,* 211 Cal.App.3d 104, this court dealt with the allocation of *tort* liability, and concluded the rule in *Stitt* allowing tortfeasor spouses to be charged with the consequences of even *negligent* torts committed during the marriage was overbroad. *Hirsch* distinguished between intentionally tortious or criminal conduct and negligent conduct during the marriage and said liability for the intentional conduct is properly allocated solely to the guilty spouse where there is no benefit to the community—but not so in the case of liability for negligent conduct. (*In re Marriage of Hirsch, supra,* 211 Cal.App.3d at p. 110.) Of course, when we deal with postseparation torts there is no need to make the

Miscellaneous Issues*

. . . . . . . . . . . . . . . . . . . . . . . . . .

Conclusion

The portion of the judgment declaring the potential liability represented by the Allen lawsuit to be community is affirmed. However, we decline to award William his costs on appeal. This appeal might not have been taken if William had not testified—contrary to the findings of the referee as it turned out—that he was an employee rather than a general contractor. Because of our discretion to allocate costs in the interests of justice (see Cal. Rules of Court, rule 26(a)), the parties shall bear their own costs on appeal.

Wallin, J., concurred. Crosby, J., concurred in the result only.

---

distinction between intentional and negligent torts, as both categories are separate under section 903, subdivision (b).

*See footnote, *ante*, page 617.