Filed 1/3/24  Marriage of Nakamoto and Hsu CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of CHRISTINE NAKAMOTO and DANIEL HSU. | |
| CHRISTINE NAKAMOTO,  Appellant,  v.  DANIEL HSU,  Respondent;  BRION CORPORATION et al.,  Claimants and Respondents. | G061363  (Super. Ct. No. 11D006853)  O P I N I O N |

Appeal from an order of the Superior Court of Orange County, James L. Waltz, Judge.  Affirmed in part, reversed in part, and remanded.

Hall Griffin, George L. Hampton IV, Laura J. Petrie, Stephanie A. Pittaluga and Eric V. Anderton for Appellant.

Masson Fatini and Richard E. Masson for Respondent.

Minyard Morris and Alexander C. Payne; Garrett C. Dailey for Claimants and Respondents.

\*          \*          \*

This divorce action between Christine Nakamoto and Daniel Hsu (collectively, the former spouses) has been ongoing for 11 years.[1] That is two years longer than their marriage. While no judgment has been entered, this is the third appeal in this action and the second appeal concerning attorney fees. Like a horror movie franchise, it appears this case will never end.

Generally, the underlying dispute is between the former spouses, on one side, and Daniel's siblings, Charleson Hsu (Chau) and Melissa Hsu See (Melissa), and several family-owned businesses – Brion Corporation, Sun Ten Museum, Inc., and Sun Ten Pharmaceutical, California – on the other (collectively, claimants). The former spouses believed claimants owed Daniel roughly $4 million, which had been transmuted to community property. Claimants denied owing Daniel anything. To settle this dispute, Christine involuntarily joined claimants to this action. The dispute proceeded to trial, where the former spouses lost.

Claimants then moved for attorney fees and costs against the former spouses based on a prior indemnity agreement Daniel and claimants had signed. The trial court awarded claimants $2,415,632.36 in costs and fees against Daniel, Christine, and the community. Christine appeals this award. First, she claims only Daniel should be liable for it. Second, she argues the court erred by including certain fees and costs in its calculation.

We partially agree with her arguments. As to her first argument, Christine's community property is liable for Daniel's indemnity obligations under Family Code section 910, subdivision (a).[2] However, the court erred by holding Christine separately liable for the award. It failed to cite any authority for holding her separately

---

[1] Since several parties share the same surname, we refer to the parties by their first name to avoid confusion.

[2] All further undesignated statutory references are to the Family Code.

2

liable, and we are not aware of any grounds for doing so. As to her second argument, we agree the court erred by including in the award the attorney fees claimants incurred litigating against Daniel. These fees are not subject to the indemnity agreement. It only covers fees claimants incurred litigating against third parties to the agreement, such as Christine. We find no error as to the other fees and costs Christine challenges.

For these reasons, we affirm in part and reverse in part the court's award of attorney fees and costs. On remand, the court shall recalculate the award as set forth in this opinion and enter a new order holding Daniel and the community liable for it.[3]


I

FACTS AND PROCEDURAL HISTORY

The following facts are taken from our prior opinions in this matter, *In re Marriage of Christine and Daniel Hsu* (Cal.Ct.App., May 30, 2017, No. G053409) (*Nakamoto I*), and *In re Marriage of Nakamoto & Hsu* (2022) 79 Cal.App.5th 457 (*Nakamoto II*), which we have supplemented with portions of the record.


A. *The Disputed Agreements*

"Daniel, Chau, and Melissa are the only children of Dr. Hong-Yen Hsu (Hong-Yen) and Dr. Ruth Lin-Run Hsu (Ruth), who accumulated substantial wealth during their lifetimes. . . . Hong-Yen passed away in 1991, and Ruth passed away in 1998." (*Nakamoto II*, *supra*, 79 Cal.App.5th at pp. 462-463.) The value of Ruth's estate is unclear from the record, but it appears to have been worth millions of dollars.

"Around 2005, Daniel became convinced Chau was hiding a portion of their parents' estate from him. He hired an attorney to assist him in obtaining his portion of these allegedly hidden assets. The three siblings met in Irvine on March 1, 2006, to

---

[3] Daniel passed away during this litigation, and his estate has chosen not to appeal.

3

address Daniel's allegations. [I]t was informally mediated by a mutual family friend, Herb Shen (Shen). After hours of discussion, the siblings reached a general agreement. It was documented in [a handwritten agreement (the Handwritten Agreement)], a terse two-page memorandum handwritten by Daniel partially in Chinese and partially in English." (*Nakamoto II*, *supra*, 79 Cal.App.5th at p. 463.)

"In its entirety, the Handwritten Agreement states, '"[$4,000,000 paid to Daniel over eight years] plus employment agreement until May 2011 annual salary of US $100,000.00.[4] Brion Corporation's stock in Aurie, Lin-Ling, Hansdale [(Daniel's children from a prior marriage)] name transfer back to company. No touch [*sic*] all the corporation and company from this point on including Foundation. [¶] Brion Corporation's stock in the name of Aurie, Lin-Ling and Hansdale the buy back amount not to exceed US $100,000.00.""'" (*Nakamoto II*, *supra*, 79 Cal.App.5th at p. 463.)

"In the underlying litigation, the parties dispute whether the Handwritten Agreement was meant to be a standalone contract or a memorandum of general points to be later incorporated into a formal written contract. The primary disagreement appears to be whether or not Daniel is still owed the $4 million set forth in the Handwritten Agreement. The conflict arises from the parties' divergent perspectives of the events that occurred after March 1, 2006.

"It is undisputed that on September 12, 2006, Daniel met with Shen in Taiwan and signed several documents. Chau and Melissa were not present at this meeting. One of these documents, the primary document at issue here, was [a] nine-page [Compromise Agreement for Structured Settlement (the Compromise Agreement)] entered into by Daniel, Chau, and Melissa . . . .

---

[4] "The bracketed portion of this sentence was written in Chinese. The English text within the brackets is Daniel's translation, which the parties generally agree is accurate." (*Nakamoto II*, *supra*, 79 Cal.App.5th at p. 463.)

"Under the Compromise Agreement, Daniel agreed to give up all claims to his parents' estate and to sell his shares in Brion Corporation to Chau for $100,000, eliminating his interest in the company. . . . Brion Corporation would retain Daniel as a senior manager with a salary of $100,000 per year plus health insurance, and he would be employed until the earlier of his death, incapacity, or his 66th birthday, which was in May 2011. Significantly, though, the Compromise Agreement did not mention the $4 million payment discussed at the March 1, 2006 meeting.

"The same day he signed the Compromise Agreement, Daniel also signed various documents concerning a parcel of real property on Roosevelt Road in Taipei, Taiwan (the Roosevelt Property). Daniel owned the land and co-owned a building on the property with Chau. Initially, Daniel had planned to donate the Roosevelt Property to a local theological college. To facilitate the transfer, Chau and Daniel created a real estate trust in March 2006 naming the college as the beneficiary of the Roosevelt Property. At some point prior to the September 12 meeting, however, the donation became unviable because the college could not afford the transfer tax. After the donation fell through, Melissa and Chau agreed to buy the property from Daniel. The purchase was documented through a property sale agreement, signed on September 12, 2006, in which Chau and Melissa purchased the Roosevelt Property for $4 million (the Chau/Melissa Sale Agreement)." (*Nakamoto II*, *supra*, 79 Cal.App.5th at pp. 463-464, fn. omitted.)

"According to Chau, Daniel wanted the $4 million agreed upon at the March 1, 2006 meeting paid outside the United States, which Chau asserts was done to avoid American taxes. When the donation of the Roosevelt Property fell through, Chau suggested to Daniel around July 2006 that he could purchase the Roosevelt Property from Daniel to pay him the $4 million discussed on March 1, 2006. Since Daniel had planned on donating the Roosevelt Property, its market value was irrelevant to him. In contrast, Daniel insist[ed] the sale of the Roosevelt Property was unrelated to the $4 million discussed on March 1, 2006. As Daniel recounts, he learned from Shen on September 12,

5

2006, that the college could not accept his donation and that his siblings were interested in purchasing the Roosevelt Property. Since the property could not be donated, he decided to sell it to his siblings for $4 million, which generally reflected the property's market value.

"Chau and Melissa subsequently made two payments to Daniel under the Chau/Melissa Sale Agreement in December 2006 and May 2007 totaling $350,000. Sometime in 2007, Shen approached Daniel about Sun Ten [Pharmaceutical, California] purchasing Daniel's interest in the Roosevelt Property rather than Chau and Melissa. Sun Ten had been established by Hong-Yen and Ruth in 1946, and Chau was chairman of its board of directors at the time. Daniel and Sun Ten signed a new Property Sale Agreement on June 7, 2007, in which Sun Ten agreed to purchase the Roosevelt Property for $4 million paid over eight years . . . ." (*Nakamoto II*, *supra*, 79 Cal.App.5th at p. 465.)

"Sun Ten made payments to Daniel for the Roosevelt Property up until 2013." (*Nakamoto II*, *supra*, 79 Cal.App.5th at p. 466.)

*B. The Trial*

Daniel and Christine married in 2002. The day after their wedding, Daniel wrote Christine a note stating, "'[a]s expression of my affection to you as my wife I give you and share with you equally everything I owned now and all the possessions my parents have give to me once my portion is settle. This is my pledge to you." (*Nakamoto I*, *supra*, G053409.) In *Nakamoto I*, we found this note was a valid transmutation that converted Daniel's separate property, including his inheritance, to community property. (*Ibid.*)

Christine filed for divorce in July 2011. She later involuntarily joined claimants to the divorce proceeding on grounds they were holding community property. (*Nakamoto II*, *supra*, 79 Cal.App.5th at p. 466.) In response, claimants filed a civil

6

lawsuit against Daniel and Christine. They demanded Daniel pay their attorney fees and costs in the divorce action based on an indemnity provision (the indemnity provision) in the Compromise Agreement. Claimants also filed a cross-complaint in this action seeking the same relief.

The former spouses' "claims against claimants proceeded to trial, in which the primary dispute was whether the Handwritten Agreement or the Compromise Agreement was enforceable. The [former] spouses alleged claimants owed them $4 million under the Handwritten Agreement. Claimants maintained the Handwritten Agreement was never intended to be a binding contract. Rather, according to them, it was only a summary of the deal points discussed at the March 1, 2006 meeting, and all parties understood that formal contracts would be subsequently drafted and signed by the parties." (*Nakamoto II*, *supra*, 79 Cal.App.5th at p. 466.)

Trial began in November 2019. At its end, the court found in favor of claimants. It ruled the Compromise Agreement was valid, enforceable, and controlling, while the Handwritten Agreement was not a valid contract. Daniel requested interlocutory review of this ruling, but this division denied his request. (*Nakamoto II*, *supra*, 79 Cal.App.5th at pp. 466-467.)

*C. Need-Based Attorney Fees*

Christine and Daniel each requested need-based attorney fees from claimants under section 2030 before, during, and after the trial. Most of their requests were at least partially granted. By the time trial commenced, the court had awarded need-based fees in the amount of $140,000 to Daniel and $115,000 to Christine. (*Nakamoto II*, *supra*, 79 Cal.App.5th at p. 467.) Then, on the final day of trial, Daniel and Christine each asked for more need-based fees. The trial court denied their respective requests in two separate orders. (*Id*. at pp. 467-468.)

7

The first order (the attorney fees ruling) found Christine and Daniel had each failed to show their respective fee requests were reasonable. (*Nakamoto II*, *supra*, 79 Cal.App.5th at p. 468.) The second order (the indemnity ruling) determined the former "spouses were barred from seeking attorney fees from claimants under the indemnity provision." (*Ibid.*) The court found "'Daniel ha[d] an obligation to defend and indemnify Claimants for all matters embraced by the indemnity provision, which necessarily include[d] all costs incurred and/or related to this action.'" (*Ibid.*) Due to Daniel's indemnity obligations, the former spouses could not seek fees against claimants under section 2030. (*Ibid.*)

In the indemnity ruling, the court rejected Christine's argument that only Daniel was bound by the indemnity provision because she was not a party to the Compromise Agreement. It ruled, "Christine (aka the community) [is] subject to [the] indemnity provision." The court explained that under section 910, subdivision (a), "'the community estate is liable for a debt incurred by either spouse before or during marriage . . . .' [Citation.] . . . Daniel's obligation (the community's obligation) to defend and indemnify Claimants includes all matters embraced by the indemnity and necessarily includes Christine's attempt to set aside the Compromise Agreement . . . . The indemnity provision shifts Claimants' liability for any fees due Christine (if any) to Daniel and the community as the indemnitor." The court cited *Marriage of Feldner* (1995) 40 Cal.App.4th 617 (*Feldner*), in support.

The court also found the community liable because Christine was a third party beneficiary to the Compromise Agreement. "Christine undisputedly enjoyed the benefits of the Compromise Agreement . . . , including through litigation." Likewise, the court explained Daniel had "assigned his rights, if any, to Christine to contest and/or conduct discovery against Claimants . . . . In essence, . . . Daniel had 'laid off' to Christine litigation involving Claimants; indeed, it was Christine who motioned the court to involuntarily join the Claimants, and Christine succeeded in doing so, over objection."

8

In *Nakamoto II*, Daniel argued the trial court had incorrectly denied his request for section 2030 fees in the attorney fees ruling and the indemnity ruling. We affirmed the court's denial based solely on the attorney fees ruling. (*Nakamoto II*, *supra*, 79 Cal.App.5th at p. 461-462.) We declined to address the indemnity ruling because even if it was wrongly decided, "it would have no effect on the outcome of [the] appeal. The court's denial of attorney fees would still stand based on . . . the attorney fees ruling." (*Id*. at p. 476.)

## D. *Claimants' Attorney Fees and Costs*

While *Nakamoto II* was pending, claimants requested $2,415,632.36 in fees and costs for this action and the civil action from Christine and Daniel under the indemnity provision. The court fully granted their request. It issued an award (the award) ordering "Petitioner [(Christine)], Respondent [(Daniel)], and/or the martial [*sic*] community . . . to reimburse Claimants for costs, expenses, and attorneys' fees incurred in the amount of $2,415,632.36 . . . ." The court explained it had previously found Christine, Daniel, and the community liable for claimants' attorney fees and costs in the indemnity ruling. The only outstanding issue following the indemnity ruling was the amount of attorneys' fees and costs they owed.

The award also summarized the grounds set forth in the indemnity ruling for holding "Christine (aka the community)" liable for claimants' attorney fees and costs. Under the indemnity ruling, her liability was based on (1) section 910, subdivision (a), and *Feldner*; and (2) her status as a third party beneficiary to the Compromise Agreement.

9

Christine challenges the award in this appeal.[5]  Primarily, she argues only Daniel is liable for the award.  She also contends the court improperly included certain fees and costs in the award's calculation.

## II

## DISCUSSION

### A.  *Liability for the Award*

Christine argues that neither her separate property nor the community can be held liable for the award.  Though Christine largely focuses on her separate liability, we begin by addressing the community's liability.

### 1.  *Community Liability*

The court found the community liable for the award under section 910, subdivision (a).  It provides, "[e]xcept as otherwise expressly provided by statute, the community estate is liable for a debt incurred by either spouse before or during marriage, . . . regardless of whether one or both spouses are parties to the debt . . . ."  (§ 910, subd. (a).)  As to contractual debts, "[a] debt is 'incurred' . . . [¶] . . . at the time the contract is made."  (§ 903.)  Thus, the community is liable for a spouse's contractual obligations if the relevant contract was formed during the marriage.  (*In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 686 (*Nassimi*); *Feldner*, *supra*, 40 Cal.App.4th at p. 622.)

Here, the indemnity provision is part of the Compromise Agreement, which was formed during the marriage.  Because Daniel's indemnity obligations were incurred during the marriage, the community is liable for them under section 910.  (*Nassimi*,

---

[5]  While it does not appear that judgment has been entered in this action, a party may appeal "a pendente lite attorney fees order where nothing remains for judicial determination except the issue of compliance or noncompliance with its terms."  (*In re Marriage of Weiss* (1996) 42 Cal.App.4th 106, 119.)

10

*supra*, 3 Cal.App.5th at p. 686; *Feldner*, *supra*, 40 Cal.App.4th at p. 622.) We are unpersuaded by Christine's assertions that an exception to section 910 applies.

The first exception Christine cites is found in section 2625. This statute states, "all separate debts, including those debts incurred by a spouse during marriage and before the date of separation that were not incurred *for the benefit of the community*, shall be confirmed without offset to the spouse who incurred the debt." (§ 2625, italics added.) Christine maintains Daniel's release and waiver of his inheritance under the Compromise Agreement "were clearly not a *benefit* to the community." Thus, she asserts Daniel's indemnity obligations under the Compromise Agreement are his separate property.

Here, the court found the Compromise Agreement benefitted the community because it provided (1) employment to Daniel with an annual salary of $100,000; (2) a payment of $350,000 in March 2007 for the Roosevelt Property; (3) payments totaling $3 million between March 2007 and March 2013 for the Roosevelt Property; and (4) health insurance. We review these factual findings under the substantial evidence standard. (*In re Marriage of Oliverez* (2019) 33 Cal.App.5th 298, 316.) In doing so, we presume these findings are supported by the record. The burden is on Christine to show they are not. (*Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1326.)

Christine has not met her burden. She argues the Compromise Agreement's benefits were outweighed by the detriment caused by Daniel's release of his inheritance. But under substantial evidence review, if "'substantial evidence [is] found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.'" (*Jameson v. Five Feet Restaurant, Inc.* (2003) 107 Cal.App.4th 138, 143, italics omitted.) Here, the facts cited by the trial court are sufficient to support its conclusion that the Compromise Agreement benefitted the community. We do not reweigh the benefits and obligations of

11

the Compromise Agreement on appeal to determine whether this finding was erroneous. (See *In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

Christine also claims the Compromise Agreement did not benefit the community because she did not agree to it and was not aware of it. But neither of these factors are prerequisites for community liability under section 910. For example, the community can be held responsible for obligations arising from a spouse's criminal or tortious conduct if that conduct benefitted the community. This is true even if the innocent spouse was unaware of their partner's misconduct. (*Nassimi*, *supra*, 3 Cal.App.5th at p. 693.)

Christine also analogizes this case to *In re Marriage of Cairo* (1988) 204 Cal.App.3d 1255, 1267, which ruled a husband's gambling debts were his separate property. But the gambling debts in *In re Marriage of Cairo* "were not incurred for the benefit of the community." (*Ibid.*) That is not the case here.

The second exception Christine cites is section 1000, subdivision, (a), which states, "A married person is not liable for any *injury or damage caused by the other spouse* except in cases where the married person would be liable therefor if the marriage did not exist." (Italics added.) But section 1000 applies to injuries or damages caused by a tortfeasor spouse. (*In re Marriage of Stitt* (1983) 147 Cal.App.3d 579, 587 [construing former Civil Code section 5122, the predecessor to section 1000].) This case does not involve tort liability. Thus, section 1000 is inapplicable.

Because the court properly found the community liable for the award based on the indemnity provision and section 910, we need not address Christine's other arguments regarding her status as a third party beneficiary or assignee.

2. *Christine's Separate Liability*

In addition to finding the community liable for the award, the court held Christine and Daniel separately liable. In the award, it ordered, "Petitioner [Christine],

12

Respondent [Daniel], and/or the martial [*sic*] community . . . to reimburse Claimants . . . in the amount of $2,415,632.36." Christine argues the court erred by holding her separate property liable for the award. We agree.

Before we proceed, we address an ostensible ambiguity in the award. The court's analysis in the award entirely focuses on the community's liability. It expressly frames Christine's liability as an issue of community liability: "[I]s Christine (*aka the community*) subject to [the] indemnity provision within the compromise agreement . . . when Christine never signed the document or even knew it existed until many years later? [¶] Yes." (Italics added.) Nothing in the award's analysis addresses Christine's separate liability. Yet, as set forth above, the award holds Christine separately liable. Arguably this is a clerical error, with the court failing to specify that only Christine's community property was liable. But Christine does not make this argument. Thus, we will not address this issue and will focus on the arguments she does make.

First, Christine argues she cannot be held separately liable under section 910.[6] We agree. Section 910, subdivision (a), addresses whether "the *community estate* is liable for a debt incurred by either spouse before or during marriage." (Italics added.) Nothing in section 910 allows for a married person to be held separately liable for their spouse's debts. (See *Gagan v. Gouyd* (1999) 73 Cal.App.4th 835, 843 [married person's community but not separate property would be liable for spouse's debt under section 910], disapproved of on other grounds by *Mejia v. Reed* (2003) 31 Cal.4th 657, 661; *In re Keck* (S.D. Cal. 2020) 613 B.R. 751, 758 [section 910 concerns community liability not individual liability].) Indeed, section 913, subdivision (b)(1), clarifies that "[t]he separate property of a married person is *not liable* for a debt incurred by the person's

---

[6] Christine also argues she cannot be held separately liable under *Feldner*. But the relevant holding in *Feldner* was based on section 910. (*Feldner*, *supra*, 40 Cal.App.4th at pp. 619-620.) Thus, we need not separately analyze *Feldner*.

spouse before or during marriage," except when otherwise provided by statute. (Italics added.)

Second, Christine contends she cannot be held separately liable for the award as a third party beneficiary to the Compromise Agreement. Among other arguments, she claims contract liability cannot be imposed on a third party beneficiary. Since the court's analysis focused on the community's liability, it cited no legal authority for holding Christine separately liable for the indemnity provision as a third party beneficiary. Nor are we aware of any legal grounds for doing so.

Claimants argue a married person's separate property is routinely held liable for his or her spouse's contractual debts, even when he or she is not a party to the contract. But none of the cases they cite involve third party beneficiaries. (See, e.g., *Direct Capital Corp. v. Brooks* (2017) 14 Cal.App.5th 1168, 1170 [applying section 914, which we address below]; *Collection Bureau of San Jose v. Rumsey* (2000) 24 Cal.4th 301, 304 [applying Probate Code sections 13550 and 13554, which concern a surviving spouse's liability after their partner's death]; *Credit Bureau of Santa Monica Bay Dist., Inc. v. Terranova* (1971) 15 Cal.App.3d 854, 856 [applying former Civil Code section 5121]; *Evans v. Noonan* (1912) 20 Cal.App. 288, 291 [applying former Civil Code 171].) Thus, these cases have no bearing on whether Christine can be held separately liable for the award as a third party beneficiary.

Further, while third party beneficiaries can sometimes be held liable for contractual attorney fee provisions (*Sessions Payroll Management, Inc. v. Noble Construction Co.* (2000) 84 Cal.App.4th 671, 679), we are not aware of any cases holding a third party beneficiary liable for an indemnity obligation.

14

Nor are attorney fee provisions and indemnity agreements sufficiently analogous to extend the rule governing third party beneficiary liability from the former to the latter. As to attorney fees provisions, courts have found third party beneficiaries liable for fees to ensure a reciprocal remedy under Civil Code section 1717. (*Ibid.*) A third party beneficiary that sues a signatory defendant and loses may be liable for fees if the signatory defendant would have been obligated to pay the third party beneficiary's fees if the result had been reversed. (*Ibid.*) Unlike attorney fee provisions, though, indemnity agreements are generally not reciprocal. Rather, they "'are intended to be unilateral agreements.'" (*Rideau v. Stewart Title of California, Inc.* (2015) 235 Cal.App.4th 1286, 1296–1297.) Because they are not reciprocal, there is no basis to extend the rule concerning attorney fee liability for third party beneficiaries to indemnity agreements.

Third, Christine argues Daniel's indemnity obligations under the Compromise Agreement were not assigned to her. We agree. The court referenced a purported assignment when analyzing the community's liability for the award. The purported assignment is contained in a Memorialization of Facts and Promises (the Memorialization) formed by Christine and Daniel in 2011. It contains no grounds for holding Christine separately liable for the award: "Husband now gives his Wife the full authority to review and access all family estate documents that would verify and substantiate the worth of his estate. Once the monetary worth of his portion of the estate is validated and verified to his Wife's satisfaction, he agrees to compensate her 50% of the worth of his portion of the estate as promised."

In the assignment, Daniel only gave Christine authority to access documents to substantiate the value of his family's estate, and he agreed to give her half of his share. He did not assign any of his obligations under the Compromise Agreement to Christine.

15

Claimants suggest Daniel could have made an oral assignment of his indemnity obligations to Christine. But they cite nothing in the record to support this theory. Besides, the Memorialization contains an integration clause, stating, "This document memorializes the entire understanding between the Parties with respect to the subject matter herein, *and supersedes all prior agreements and understandings, whether oral or in writing*. This memorialization of these facts and promises may not be modified, altered, amended, terminated or waived, *except by an instrument in writing executed by both Parties or by order of the Court*." (Italics added.) This integration clause would nullify any oral assignment made before or after the Memorialization.

Claimants also contend Christine is separately liable under section 914, which contains an "'exception to the general rule that a married person's separate property is not liable for debts incurred by his or her spouse during marriage.'" (*Direct Capital Corp. v. Brooks* (2017) 14 Cal.App.5th 1168, 1172.) Section 914, subdivision (a)(1), states, "a married person is personally liable for . . . [¶] [a] debt incurred for necessaries of life of the person's spouse before the date of separation of the spouses."

Here, the award does not expressly or implicitly reference section 914. Further, we have not been cited anything in the record showing claimants ever referenced section 914 below. Nor have we found any such references after conducting an independent search of the record.

Generally, a respondent on appeal may assert any *legal* theory supporting affirmance of an order, even if the trial court did not consider it. (*Acres v. Marston* (2021) 72 Cal.App.5th 417, 450.) However, holding Christine separately liable under section 914 requires findings as to whether the Compromise Agreement provided her with the necessaries of life. We cannot make these findings on appeal. "[W]hat constitutes necessaries depends on the circumstances of the particular marriage." (*Direct Capital Corp. v. Brooks*, *supra*, 14 Cal.App.5th at p. 1174.) For debts incurred prior to separation, courts "looks to the marital standard and mode of living." (*Ibid*.) Because the

16

court made no factual findings as these factors, we cannot determine whether the Compromise Agreement provided Christine with the necessaries of life. Nor can we imply the court made these factual findings. "Where a written order clearly expresses the legal and factual basis for the trial court's resolution of controverted issues, an appellate court will not imply findings the trial court did not make." (*L.Q. v. California Hospital Medical Center* (2021) 69 Cal.App.5th 1026, 1049.) As such, we cannot affirm the award under section 914.

## B. Amount of the Fee Award

Since we have found Christine's share of community property liable for the award, we proceed to her next argument. She contends the trial court erroneously included the following amounts in the award: (1) fees claimants incurred litigating against Daniel's claims; (2) need-based fees awarded to Christine and Daniel under section 2030; and (3) fees incurred by attorney Julie Peccorini for consulting work. We agree the court erroneously included the first category of fees but find no error as to the second and third categories.

### 1. Fees for Daniel's claims

Christine argues the indemnity provision only covers third party claims and does not cover claims between the parties to the Compromise Agreement. Since Daniel is a party to the Compromise Agreement, Christine maintains the indemnity provision does not cover the fees claimants incurred litigating against him. The trial court disagreed and ruled the indemnity provision covered these fees. We review this ruling de novo. (*Hot Rods, LLC v. Northrop Grumman Systems Corp.* (2015) 242 Cal.App.4th 1166, 1178 [de novo review applies where contract interpretation does not rely on extrinsic evidence].)

17

"'"'Indemnification agreements ordinarily relate to third party claims."'"' (*Rideau v. Stewart Title of California, Inc.*, *supra*, 235 Cal.App.4th at p. 1298.) But "'this general rule does not apply if the parties to a contract use the term "indemnity" to include direct liability as well as third party liability.' [Citation.] '[E]ach indemnity agreement is "interpreted according to the language and contents of the contract as well as the intention of the parties as indicated by the contract."' [Citation.] When indemnity is expressly provided by contract, the extent of the duty to indemnify must be determined from the contract itself." (*Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1024.)

Indemnity provisions are construed under the same rules for interpreting contracts. (*Zalkind v. Ceradyne, Inc.*, *supra*, 194 Cal.App.4th at pp. 1024-1025.) "We must view the language of a contract as a whole, avoiding a piecemeal, strict construction approach. If possible, we should give effect to every provision and avoid rendering any part of an agreement surplusage." (*Segal v. Silberstein* (2007) 156 Cal.App.4th 627, 633.) "Interpretation of a contract 'must be fair and reasonable, not leading to absurd conclusions.'" (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1269.) As we explain below, nothing in the Compromise Agreement warrants departure from the general rule that indemnity agreements relate to third party claims.

In the indemnity provision, Daniel warranted that he had not assigned or transferred his inheritance rights to a third party. He then "agree[d] to indemnify and hold harmless each of the Discharged Parties [(which included Claimants)] from any right, claim, contention or action, and cost or expense incurred (including attorneys' fees whether or not litigation is commenced) in relation to any right, claim, contention or action, to the extent that such right, claim, contention or action is based on, connected with or arises out of any such assignment or transfer or attempted assignment or transfer."

Nothing in the indemnity provision expressly states it covers direct liability between the parties to the Compromise Agreement. Moreover, the Compromise Agreement includes an attorney fee provision (the attorney fee provision), which immediately follows the indemnity provision. It states, "Each party shall bear that party's own attorneys' fees and [*sic*] arising from or in connection to this Agreement or the matters referred to herein."

Within the attorney fee provision, the phrase "arising from or in connection to [the Compromise] Agreement or the matters referred herein" is expansive. It extends to all fees incurred by Daniel and claimants litigating the Compromise Agreement's enforceability against each other, as these fees are clearly connected to the Compromise Agreement. Thus, under the attorney fee provision, claimants are responsible for the fees they incurred litigating against Daniel.

The trial court found Daniel and the community (per section 910) responsible for claimants' fees under the indemnity provision. But the trial court's interpretation renders the attorney fee provision surplusage, which we must avoid if possible. (*Segal v. Silberstein*, *supra*, 156 Cal.App.4th at p. 633; *ASP Properties Group, L.P. v. Fard, Inc.*, *supra*, 133 Cal.App.4th at p. 1269.) The more reasonable interpretation, which we adopt, is that the parties intended the indemnity provision to cover third party claims concerning the Compromise Agreement. The attorney fee provision was intended to govern claims between the parties to the Compromise Agreement, *i.e.*, claims between Daniel and claimants.

Based on our interpretation of the Compromise Agreement, the fees claimants incurred litigating against Daniel are not covered by the indemnity provision. Rather, they are covered by the attorney fee provision, in which claimants agreed to pay these fees themselves. Thus, claimants cannot seek reimbursement of these fees from Daniel or the community, and the court erred by including them in the award.

19

To clarify, Christine is not a party to the Compromise Agreement. Thus, under the indemnity provision, Daniel and the community must still indemnify claimants for the fees they incurred defending against her claims. This extends to any fees spent attempting to enforce the indemnity provision against her. Under the indemnity agreement, claimants could seek indemnification from Daniel for any "cost or expense incurred" relating to "any right, claim, contention or action," so long as it is "connected with or arises out of" any assignment or transfer of Daniel's inheritance rights. Here, claimants alleged right to indemnification from Christine arose from her challenge to Daniel's inheritance, which he transferred to the community. The indemnity provision is broad enough to cover claimants' fees and costs to enforce this right against Christine. Although claimants did not prevail on their theory that Christine was separately liable, nothing in the indemnity provision conditions indemnity on the outcome of the dispute.

We are aware that Daniel and Christine's theories and motions largely overlapped. We also understand that it will be difficult to untangle how much attorney fees were incurred litigating Daniel's claims versus Christine's claims. We also recognize this decision will likely spur more rounds of litigation between Christine and claimants. However, Daniel and claimants are bound by their contract. In the attorney fee provision, Daniel and claimants agreed to bear their own fees "arising from or in connection to" the Compromise Agreement. The claims between Daniel and claimants are all connected to the Compromise Agreement. As such, claimants must bear their own attorney fees for these claims, as they agreed to do. Since we do not have enough information to determine how much the award should be reduced, we remand to the trial court to make this determination and apply its discretion where applicable.[7]

---

[7] The attorney fee provision is ambiguous as to whether it includes attorney fees and costs or solely attorney fees. To the extent the parties to the appeal dispute this issue, we leave it for the trial court to determine on remand.

20

*2. Section 2030 fees*

In calculating the amount of the award, the court included the need-based fees claimants had paid Daniel and Christine during this litigation under section 2030. Christine argues the court erred by ordering indemnification of these need-based fees, which she claims totaled $350,000. We find no error with including these fees in the award.

We start with the section 2030 fees claimants paid Daniel. Christine's argument is based on her argument from this opinion's previous section II.B.1. She contends the section 2030 fees paid to Daniel were improperly included in the award because the indemnity provision does not cover fees incurred in litigation between Daniel and claimants. We agree these fees are not covered by the indemnity provision. Rather, as sets forth above, they are covered by the attorney fee provision.

However, Christine's argument overlooks that Daniel waived his right to need-based fees from claimants in the attorney fee provision. (See, e.g., *Nassimi*, *supra*, 3 Cal.App.5th at pp. 683-684, 697-698 [parties waived right to section 2030 fees]; *In re Marriage of Guilardi* (2011) 200 Cal.App.4th 770, 772, 775 [same].) In the attorney fee provision, Daniel agreed to bear his own attorney fees for litigation against claimants connected to the Compromise Agreement. Since the litigation between Daniel and claimants was all connected to the Compromise Agreement, Daniel must bear his own attorney fees and, accordingly, reimburse claimants for the section 2030 fees they gave him. Thus, the court did not err by including Daniel's need-based fees in the award.[8]

We next address the section 2030 fees awarded to Christine. First, Christine contends that allowing indemnity of these need-based fees is an improper reversal of the court's prior rulings awarding those fees. She argues claimants have

---

[8] Christine provided no argument as to whether the community would be liable for these need-based fees if Daniel were found liable. We will not make this argument for her. (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 656.)

21

waived their rights to seek indemnification of these fees because they failed to appeal those prior orders. This argument mischaracterizes the applicable procedure. Claimants do not seek reversal of the prior orders. Rather, they seek indemnification of the awarded need-based fees under the indemnification provision. This is not the same as seeking reversal of a prior order.

Christine also appears to argue that section 2030 fees cannot be modified by contract. To the extent they can, she argues she cannot be held separately liable to claimants for her need-based fees because she never waived her right to them.

Her first argument is incorrect. Courts have found that need-based fees can be modified by contract. (See, e.g., *Nassimi*, *supra*, 3 Cal.App.5th at pp. 683-684, 697-698; *In re Marriage of Guilardi*, *supra*, 200 Cal.App.4th at pp. 772, 775.)

As to her second argument, Christine is not separately liable for the award. The community is liable for Daniel's indemnity obligations under section 910 because the Compromise Agreement, which contains the indemnity provision, was made during the marriage. (*Feldner*, *supra*, 40 Cal.App.4th at p. 622.) Christine has not provided any argument as to why section 910 would not apply to these fees.

### 3. *Peccorini's fees*

Finally, Christine contends the court erroneously awarded claimants $425,882 in fees and $58,356 in costs billed by attorney Julie Peccorini. Peccorini drafted the Compromise Agreement. She initially served as claimants' counsel in this litigation but was disqualified as a potential percipient witness. She was not disqualified for any confidentiality conflicts. Claimants purportedly retained Peccorini as a consultant after she was disqualified, and the fees and costs at issue relate to her consulting work.

First, Christine appears to argue that Peccorini's continued work as a consultant after being disqualified was unethical and a violation of the disqualification order. Thus, she asserts claimants should not be indemnified for Peccorini's fees and

costs. But Christine cites no facts or law supporting her argument. As to the facts, the trial court rejected Christine's claims that Peccorini's work as a consultant was unethical or constituted bad faith. Christine has not cited anything in the record showing this finding was erroneous. As to the law, Christine has not cited any authority requiring a court to deny indemnity based on an attorney's ethical violation.

Second, Christine argues the indemnity provision does not cover consulting fees. We disagree. The indemnity provision covers "any . . . cost or expense [claimants] incurred" defending against Christine's challenges to Daniel's inheritance. "[A]ny . . . cost or expense" is broad enough to cover consulting fees. Further, the trial court found Peccorini's fees were related to Christine's challenges to Daniel's inheritance. Christine has not shown this finding is unsupported by the record.

To clarify, any fees Peccorini billed pertaining to Daniel's claims should have been omitted from the award. As set forth above, the indemnification provision relates to third party claims, not claims between Daniel and claimants.

III

DISPOSITION

The award is reversed in part and affirmed in part. We reverse the award to the extent it (1) held Christine separately liable for the award, and (2) included the attorney fees claimants incurred litigating against Daniel in this action and the related civil action. The award is affirmed in all other respects. The parties shall bear their own costs on appeal.

On remand, the court shall recalculate the amount of the indemnification award, deducting any fees claimants incurred litigating against Daniel in this action and the related civil action. The court has discretion to determine how to calculate this reduction. After the court has finished its recalculation, it shall enter a new order naming

23

the community and Daniel, in his individual capacity, liable for the sum awarded.  The order shall not hold Christine separately liable for the award.


                                    MOORE, ACTING P. J.

WE CONCUR:


GOETHALS, J.


SANCHEZ, J.